No. 92-310

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

JEANNINE NEWVILLE and DAMON GANNETT,
Co-Guardians ad litem for R.M., a minor,
    Plaintiffs, Appellants and Cross-Respondents,

    -v-

STATE OF MONTANA, DEPARTMENT OF FAMILY
SERVICES, an agency of the state of
Montana,
    Defendant, Respondent and Cross-Appellant.

**FILED**

AUG 2 9 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
        In and for the County of Gallatin,
        The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Monte D. Beck, John J. Richardson, Beck Law Offices,
        Bozeman, Montana; Larry A. Anderson, Howard F.
        Strause, Great Falls, Montana

    For Respondent:

        R.H. Bellingham, T. Thomas Singer, Moulton,
        Bellingham, Longo and Mather, Billings, Montana

    For Amci:

        Robert J. Phillips, John E. Bohyer, Phillips &
        Williams, Missoula, Montana; Randy J. Cox, Boone,
        Karlberg & Haddon, Missoula, Montana (Montana
        Defense Trial Lawyers Association)

        L. Randall Bishop, Jarussi & Bishop, Billings,
        Montana; Donald W. Molloy, Billings, Montana; David
        R. Paoli, Missoula, Montana (Montana Trial Lawyers
        Association)

                Heard:    Oct. 14, 1993
           Submitted:    March 16, 1994

            Decided:    August 29, 1994

Filed:

                    Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal by the plaintiffs from a jury verdict arising out of the Eighteenth Judicial District Court, Gallatin County, in favor of plaintiffs' ward, R.M., in a negligence action concerning severe injuries inflicted upon R.M. by her foster father while in his care pending an adoption. The jury attributed negligence under § 27-1-703, MCA, Montana's comparative negligence statute, to the State of Montana Department of Family Services (30%), the foster mother (35%) and a professional counselor who had treated the foster mother and father over a period of years (35%). The foster father was not listed on the special verdict form because the District Court found his conduct was intentional and not negligent. Amici curiae Montana Defense Trial Lawyers and Montana Trial Lawyers Association also presented the Court with arguments concerning constitutional issues. We affirm in part, reverse in part and remand for a new trial.

Plaintiffs now seek a new trial solely against the State of Montana Department of Family Services (the Department), presenting the Court with numerous issues, as does the Department in its Cross-Appeal, which we have restated as follows:

> I.   Do the plaintiffs have standing to assert the rights of unrepresented third persons included on the verdict form?
>
> II.  Is Montana's comparative negligence statute, § 27-1-703(4), MCA, unconstitutional as amended by the 1987 legislature?
>
> III. Did the District Court err in allowing the jury to allocate a percentage of negligence to Edna Goodwin, who settled with the plaintiffs prior to trial, when no

2

evidence had been introduced to establish the standard of care for a professional counselor?

IV. Did the District Court err in admitting evidence concerning R.M.'s biological parents?

V. Did the District Court err in instructing the jury?

VI. Is the Department immune from tort liability for its failure to protect R.M.?

VII. Who is to be included on the special verdict form if there is a subsequent trial in this action?

The plaintiffs in this case are co-guardians ad litem for R.M., an American Indian child born to a 16-year-old mother. R.M.'s natural mother left R.M. in the custody of her grandmother prior to the age of seven months and could not be located when R.M. was subsequently removed from her grandmother's home by the police at the age of seven months. Because R.M.'s mother could not initially be found and her father was unavailable, the court appointed a guardian ad litem for her and placed her in the temporary custody of the Department.

In addition to R.M.'s birth mother being under age, she and the birth father had problems with intellectual functioning and with drug and alcohol abuse. R.M.'s birth mother had dropped out of school in the 7th grade and had an I.Q. of 69. The parental rights of both R.M.'s biological parents were terminated in Yellowstone County, giving the Department permanent custody of R.M. in October 1987.

After obtaining custody of R.M., the Department placed her in a series of foster homes. By the time she was four years old, she had been in seven foster homes, including the home of Dennis and

3

Martha Kuipers. The Department removed R.M. from some of these homes because of allegations of physical abuse, sexual abuse, or neglect.

Although R.M. was available for adoption during the time she was being placed in foster care, she was not an easy child to place because of behavioral problems of the type caused by abuse. Adoptive placement was further complicated because any adoptive placement had to comply with the provisions of the Indian Child Welfare Act 25 U.S.C. § 1915.

Following a series of events beginning when Dennis Kuipers heard from a friend that R.M. was available for adoption, the Department placed R.M. in foster care with Dennis and Martha Kuipers (the Kuipers) of Belgrade, Montana, with the intent that the Kuipers would adopt her if they were qualified by the Department as adoptive parents. This was done in September 1988 after the Department investigated the Kuipers. This placement was referred to by the Department as a "fos/adopt" placement.

Dennis Kuipers is of American Indian ancestry and thus better qualified to adopt R.M. under the Indian Child Welfare Act than a non-Indian person. Dennis Kuipers himself had been adopted by a non-Indian family at a young age after being abused, neglected and abandoned. He wanted to adopt R.M. because of the positive experience of his own adoption. The Kuipers were foster parents at all times during this action as the adoption was never completed.

Testimony was presented at trial which indicated that the Department did not conduct a proper investigation prior to placing

4

R.M. in the Kuipers' home. For example, in response to a request for recommendation for adoption, the Kuipers' counselor, Edna Goodwin, wrote that Dennis Kuipers was "working on his issues of rage" and that "there was previously an issue of abuse by Dennis to his wife and to one of their two children." The Department did not contact Edna Goodwin about her comments in her letter despite permission from the Kuipers to do so. Other testimony was presented which indicated that the Department also did not follow up on other reports of abuse or check its own records for reports of abuse by Dennis Kuipers.

Ed Neuman, a Department employee, supervised the "fos/adopt" placement during the two months after R.M. was placed with the Kuipers. On October 2, 1988, just three weeks after R.M. was placed in the Kuipers' home, witnesses stated that Dennis Kuipers beat R.M. outside the Rax restaurant in Bozeman, Montana, partly in view of restaurant patrons and partly concealed within the family van. Dennis Kuipers became upset with R.M. because she had wet her pants. When he brought R.M. into the restaurant, she had black marks on her cheeks, and was described as having a fixed stare as though she were in shock. One witness testified that she looked like a "zombie."

These descriptions came from two couples who observed the incident from a location inside the Rax restaurant very near to where the Kuipers' van was parked. One witness, Salvatore Provenzano, telephoned the Bozeman police from the restaurant to report the incident. Salvatore Provenzano and his wife, Joy

5

Provenzano, went to the police station at the request of the officers to provide the Bozeman Police Department with a written report. By the time the officers had arrived at the restaurant, however, the other witnessing couple, the Stewarts, had left the restaurant. The Stewarts provided the Bozeman police with a written statement later that same week.

Two officers responded to Salvatore Provenzano's report and came to the restaurant to investigate. Officer Linda Sanem took Martha Kuipers aside and asked her numerous questions. During that interview, Martha Kuipers was holding R.M. Martha Kuipers believed at that time that no abuse had occurred. She apparently had been in the rest room and also behind a partition in the restaurant ordering food during the abuse incident. She testified that up until the time of Dennis Kuipers' plea agreement when he admitted to hitting R.M. outside the restaurant, she believed that no abuse had occurred there.

At the restaurant, while holding R.M., Martha Kuipers convinced Officer Sanem that nothing had occurred. Testimony at trial indicated that because R.M.'s hair was long, thick and dark, it may have hidden physical signs of abuse. Other testimony was presented that any initial redness may have disappeared by the time the officers arrived and any subsequent bruising may not have been present yet.

Officer Sanem testified that R.M. had bruises on her face but they looked like they were not newly-inflicted. She further testified that since none of the witnesses actually saw Dennis

6

Kuipers hit R.M.--they only saw his open hand and then his fist going up and down inside the van--and there were no apparent newly-inflicted bruises, the officers did not have probable cause to arrest Dennis Kuipers for assault. She testified that she felt uncomfortable about not being able to do anything further at that time. At the time of the investigation, the officers did not have the written reports from the Provenzanos and the Stewarts and had only briefly spoken to Salvatore Provenzano over the phone when he reported the incident. Sanem further testified:

> Unless there's obvious signs of violence, you know, physical injuries, we have to rely on what witnesses tell us as to what actually occurred. And one point of fact in this matter, that he, in fact, did not see the fist actually hit the child, does not constitute an assault.

> From our point of view, we have to look at it from a criminal standpoint and in order for it to be an assault under that statute. If there's no sign of an injury, then we have to -- have to have actually have that contact, and he couldn't say that he actually saw that.

Officer Sanem also testified that she believed Martha Kuipers' statement that the child had bruises from falling down a lot lately and that the Department was aware of that. Nonetheless, Officer Sanem told Martha Kuipers that the incident would be referred to the Department. Officer Sanem further testified that she has since had further law enforcement training and would not have made the same assessment of the Rax incident if she had had the training prior to that time.

Officer Sanem testified that she was "very suspicious about the bruises, but it was obvious to [her] that that hadn't just occurred and it was an incident that obviously needed to be further

7

investigated." She further testified that the officers had two options--to refer the incident to the Department or to take immediate custody of the child. When she observed R.M., it did not appear that she had been crying and she felt that they did not have cause to take her. At that time, she had not investigated any other abuse cases in which a child had been hurt within the previous 15-20 minutes. Officer Sanem did not call the Department that day and was off duty the following day; she left that duty of reporting the incident to the Department to Officer Paul Erickson, the other officer who was also at the Rax restaurant to investigate the report.

Officer Erickson interviewed Dennis Kuipers at the Rax restaurant and was convinced by him that he had not hit R.M., but rather may have been waving a diaper up and down or something like that. Officer Erickson, however, also advised Dennis Kuipers that the incident would be referred to the Department and more thoroughly investigated by them. Officer Erickson testified that he had been "fooled" by Dennis Kuipers.

However, the matter was referred to the Department for investigation prior to the close of the police investigation. The remainder of the police investigation included getting written statements from the Provenzanos and the Stewarts. No charges were made against Dennis Kuipers as a result of that investigation.

As previously stated, Ed Neuman supervised the placement of R.M. with the Kuipers on behalf of the Department. The Kuipers called Neuman to report the Rax incident to him later that

8

afternoon because the police officers had told them that the Department would be notified. Dennis Kuipers' discussion with Neuman minimized the seriousness of the incident and he denied hitting R.M.

Officer Erickson reported the Rax incident to the Department for further investigation. The police report actually states that R.M. was injured and an investigation was pending. The Department did investigate the incident but trial testimony demonstrated that the Department's investigation was very limited. The investigator did not search the Department's own files to check for prior reported incidents of abuse by Dennis Kuipers. That search would have provided information about the prior incident of abuse which had been investigated by the Department. In addition, the Department did not report the matter to the County Attorney as will be subsequently discussed.

One month later, on November 1, 1988, Dennis Kuipers severely beat R.M. As a result of this beating, R.M. had bruises over most of her body and she was hospitalized for two weeks. During the hospitalization, R.M. was initially in a coma. She also had seizures and was paralyzed on one side of her body. A craniotomy had to be performed to relieve acute fluid pressure on her brain. Medical experts testified at the trial that R.M. had lost substantial brain tissue as a result of the beating and that the damages were irreversible.

The plaintiffs initially sued Dennis Kuipers, Martha Kuipers, Edna Goodwin (the Kuipers' counselor), and both the Department and

9

its employee, Ed Neuman. The claim against Neuman was dismissed by the court. Both Dennis Kuipers and Edna Goodwin settled with the plaintiffs prior to trial and were dismissed pursuant to their respective agreements with the plaintiffs following the settlement conference. The trial proceeded against the remaining defendants-- Martha Kuipers and the Department.

The special verdict form presented to the jury included the Department, Martha Kuipers and Edna Goodwin. Dennis Kuipers was not included on the special verdict form because the District Court ruled that his intentional conduct made him jointly and severally liable for all damages and that § 27-1-703(4), MCA, does not permit apportionment of liability for intentional conduct.

The jury awarded total damages of $637,480, apportioning negligence comparatively--30 percent to the Department, 35 percent to Martha Kuipers and 35 percent to Edna Goodwin. Subsequent to the trial, Martha Kuipers settled with the plaintiffs and has been dismissed with prejudice, leaving the Department as the sole defendant in this negligence action.

### ISSUE I: Standing.

Do the plaintiffs have standing to assert the rights of unrepresented third persons included on the verdict form?

As a threshold issue, we address the Department's argument that plaintiffs do not have standing to challenge the constitutionality of § 27-1-703, MCA, because by doing so they are not asserting their own constitutional rights, but rather the rights of unrepresented third parties such as settling parties and unsued tortfeasors. Although this opinion does not address the

10

rights of unrepresented parties in the context of determining whether they have been denied procedural due process or equal protection, and although our ruling on substantive due process relates to plaintiffs primarily, we do agree with plaintiffs that they have standing to assert the constitutional rights of such third parties.

Plaintiffs correctly argued that their own potential economic loss gives them standing to assert the rights of third parties. They argued that unrepresented parties included on the verdict form can diminish a named defendant's portion of negligence below 50 percent, thereby making that defendant only severally liable, and that any defendants still in the action had the power to attribute blame to unrepresented tortfeasors, thereby reducing the potential damage award to less than 100 percent because plaintiffs would be unable to collect damages from unsued tortfeasors. These results could affect a totally innocent plaintiff such as R.M. in the same manner as they could affect a plaintiff with any contributory negligence up to 50 percent.

We considered a similar issue in Belth v. Bennett (1987), 227 Mont. 341, 349, 740 P.2d 638, 643, where this Court held that a state agency's records of insurance companies were not open to public inspection. The Court also concluded that because there was a potential economic loss to insurance companies as a result of suits by insurance consumers, the companies had a potential economic injury sufficient to establish standing. Belth, 740 P.2d at 641. Also, in Montana Human Rights Division v. City of Billings

11

(1982), 199 Mont. 434, 443, 649 P.2d 1283, 1288, we allowed the city to assert the privacy rights of its employees because of potential economic injury to the city from possible lawsuits against it by its employees if it divulged personal information about its employees without their consent. Both Belth and Montana Human Rights Div. held that a party facing potential economic injury may assert the constitutional rights of others.

We conclude the plaintiffs here have established they could suffer economic loss if a percentage of negligence were attributed to unrepresented parties. We further conclude the plaintiffs have established a standing sufficient to assert the rights of the unrepresented parties such as settling parties and unsued tortfeasors.

We hold plaintiffs have the right to raise constitutional issues relating to § 27-1-703, MCA, which affect the rights of unrepresented third parties.

### ISSUE II: Constitutional Issues.

Is Montana's comparative negligence statute, § 27-1-703, MCA, unconstitutional as amended by the 1987 legislature?

The plaintiffs contend that § 27-1-703, MCA, violates the constitutional guarantees of procedural and substantive due process and equal protection and thus a new trial is required in this case. As discussed below, the Court concludes that § 27-1-703(4), MCA, violates substantive due process. As a result, the Court declines to address the other constitutional issues.

This case represents constitutional challenges to major changes in § 27-1-703, MCA, which were enacted by the 1987 Montana

12

Legislature. Section 27-1-703, MCA, was a major vehicle for tort reform enacted by the Montana Legislature in response to demands from numerous factions in this state. That section concerns the determination of liability when there are multiple defendants involved in an action based upon negligence. Section 27-1-703, MCA (1987), as amended by the 1987 legislature, is set forth in its entirety in the appendix to this opinion, as is its predecessor, § 27-1-703, MCA (1985).

The 1987 Senate Judiciary Committee minutes indicate that Senate Bill 51 (SB 51), which amended § 27-1-703, MCA, was patterned after a bill in Washington state. That bill was drafted as an attempt to change Washington's comparative negligence statute and was intended to match liability for damages to fault of each of the parties involved in a tort action, excepting only the fault of employers and co-employees to the extent of their tort immunity under the Workers' Compensation Act. The stated aim of SB 51 was to protect "deep pocket" defendants such as municipal and county governments when they were faced with minimal percentages of negligence assigned to them by juries but nonetheless required to pay large judgments under joint and several liability principles.

As pointed out by Victor E. Schwartz in his comparative negligence treatise, a substantial minority of states have now abolished or severely limited the common law doctrine of joint and several liability:

> In the mid-1980's, a significant number of states changed the joint liability rule, in part, because of growing awards against "deep pocket" defendants who might be only peripherally responsible for plaintiff's injuries. A few

13

states cut the Gordian knot by abolishing the doctrine outright or limiting it to those who have acted in concert. Nevada abolished it except in cases involving strict liability, intentional torts, toxic wastes, concerted acts, or products liability. A number of other states have attempted to serve competing goals of fairness and loss distribution by adopting systems for imposing joint liability only for "noneconomic" damages or for certain percentages of fault. Some states have adopted a combination of exceptions.

V. Schwartz, Comparative Negligence § 16.4 (2d ed. Supp. 1993).

The major changes in § 27-1-703, MCA (1987), related to joint and several liability and the addition of subsection (4) mandating the trier of fact to consider the negligence of various described persons and parties in order to determine liability and apportion the percentage of liability among all such persons. Section 27-1-703(4), MCA (1987), provides in pertinent part:

> (4) . . . For purposes of determining the percentage of liability attributable to each party whose action contributed to the injury complained of, the trier of fact shall consider the negligence of the claimant, injured person, defendants, third-party defendants, persons released from liability by the claimant, persons immune from liability to the claimant, and any other persons who have a defense against the claimant. The trier of fact shall apportion the percentage of negligence of all such persons. . . .

The above-quoted subsection (4) is new and takes the place of the following from the prior statute:

> Whenever more than one person is found to have contributed as a proximate cause to the injury complained of, the trier of fact shall apportion the degree of fault among such persons.

The theory underlying substantive due process reaffirms the fundamental concept that the due process clause contains a substantive component which bars arbitrary governmental actions regardless of the procedures used to implement them, and serves as

14

a check on oppressive governmental action. Even though a plaintiff may have no property or liberty interest grounded in state law which is protected from arbitrary government action, such action still may be subject to review under substantive due process. Substantive due process primarily examines the underlying substantive rights and remedies to determine whether restrictions, such as those placed on both remedies and procedures in this case, are unreasonable or arbitrary when balanced against the purpose of the legislature in enacting the statute. See J. McGuinness and L. Parlagreco, The Reemergence of Substantive Due Process As A Constitutional Tort: Theory, Proof, and Damages, 24 New Eng. 1129, 1133 (1990).

Substantive review for due process violations applies to enactments which affect individual constitutional rights, and may thus include a review of an enactment's inherent procedural fairness. Rotunda & Nowak, 2 Treatise on Constitutional Law: Substance and Procedure § 15.4 (2d ed. 1992).

In addressing a substantive due process challenge in Harrison v. Chance (1990), 244 Mont. 215, 225, 797 P.2d 200, 206, we referred to our analysis in Linder v. Smith (1981), 193 Mont. 20, 28-29, 629 P.2d 1187, 1192, stating: "The legislature is free to impose reasonable procedural requirements on the available remedies so long as those requirements have a rational basis." Although the Linder Court held there was no substantive due process violation on the basis of the issues as raised by the parties, it did excise a portion of the statute on substantive due process grounds, stating:

15

> We find claimant's due process contentions to be without merit, particularly when considered in view of the limited effect which the panel's decision can have in Montana in subsequent litigation. We do address one issue, though, which was not initially raised by the parties to the litigation, but which came to our attention during the hearing in this case. Section 27-6-704(2), MCA, provides that "[no] statement made by any person during a hearing before the panel may be used as impeaching evidence in court." In order to uphold the constitutionality of the panel act, we determine that this section must be severed from the act. It is fundamental to our adversarial system that litigants retain the right to impeach the sworn testimony of a witness testifying against them. We are mindful that this provision was enacted to aid the fact-finding by the panel and to preserve the confidentiality of the proceedings. But we cannot say that a litigant will receive a full and fair hearing if he is unable to fully cross-examine in court the witnesses that testified in the prior hearing.

Linder, 629 P.2d 1192.

In Raisler v. Burlington N. Ry. Co. (1985), 219 Mont. 254, 263, 717 P.2d 535, 541, this Court stated, "Substantive due process analysis requires a test of the reasonableness of a statute in relation to the State's power to enact legislation." Its essence is that the State cannot use its power to take unreasonable, arbitrary or capricious action against an individual. Raisler, 717 P.2d at 541. Therefore, in order to satisfy guarantees of substantive due process, a statute enacted by the legislature must be reasonably related to a permissible legislative objective. Raisler, 717 P.2d at 541. See also Ball v. Gee (1990), 243 Mont. 406, 412, 795 P.2d 82, 86, citing In re C.H. (1984), 210 Mont. 184, 194, 683 P.2d 931, 936.

In Montana Milk Control Bd. v. Rehberg (1962), 141 Mont. 149, 158-59, 376 P.2d 508, 514, this Court determined that substantive

16

due process was not violated by legislation which allowed the State to control the retail price of milk and determined that the legislation was reasonably related to the permissible legislative purpose of ensuring an adequate supply of wholesome milk to the citizens of Montana. More recently, in In the Matter of the Adjudication of the Yellowstone River (1992), 253 Mont. 167, 179, 832 P.2d 1210, 1217, we stated that the State's regulatory power over adjudicating water rights must be exercised consistent with principles of substantive due process:

> A statute must be reasonably related to a permissible legislative objective to satisfy substantive due process guarantees. . . . The 1972 Montana Constitution mandates that the legislature "establish a system of centralized records." There can be no doubt that § 85-2-226, MCA, was enacted for a permissible legislative objective.
>
> However, the appellants challenge whether . . . § 85-2-226, MCA, is reasonably related to the objective of adjudicating water rights. It is contended that . . . [§] 85-2-226, MCA, . . . fails to be reasonably related to these objectives, because its operation results in the elimination of existing water rights. (Citations omitted.)

In Matter of Yellowstone River, 832 P.2d at 1217, we ruled that the challenged statute did not violate substantive due process in that it was a reasonable means of "compelling comprehensive participation, extinguishing duplicative and exaggerated rights, and ridding local records of stale, unused water claims." The statute's filing requirement was "neither burdensome, unreasonable nor unrelated to the legitimate and proper legislative objectives." Matter of Yellowstone River, 832 P.2d at 1217. We further noted that neither the Supreme Court nor other states addressing the

17

constitutionality of statutes requiring filing had found the filing requirement to be more than a minimal burden. Matter of Yellowstone River, 832 P.2d at 1217.

Although most of the challenges brought to this Court which have been grounded in substantive due process have failed, we have ruled that substantive due process was violated by a restrictive covenant in Town & Country Estates Ass'n v. Slater (1987), 227 Mont. 489, 493, 740 P.2d 668, 671. The restrictive covenant which violated substantive due process in Town & Country Estates allowed a Design Review Committee to disapprove house plans and prevent construction of homes in the subdivision. We held that the covenant was vague to a degree that violated substantive due process and was enforceable only when used in connection with some general plan or scheme. Town & Country Estates, 740 P.2d at 671.

In Town & Country Estates, the houses already built in the subdivision were each unique in design and demonstrated a "cacophony of styles" with a "hybrid mix of traditional, Tudor, ranch, and contemporary" with the only common design characteristics being a 2400 square foot size minimum and a shake roof. Town & Country Estates, 740 P.2d at 671. The Court stated:

> If the subdivision itself lacks consonance, the Slaters' plan cannot lack harmony. In the context of [Town and Country Estates] and Slaters' plan, the term "harmony of external design" lacks the mutuality of obligation central to the purpose of a restrictive covenant. In view of the wide variety of designs, no one seemed burdened by the covenant except the Slaters.
>
> . . .
>
> The approval or disapproval of plans by the [Design Review Committee] must be based upon an objective design

18

standard. Without a quantifiable standard to guide them, the decision . . . is unenforceable. . . . We hold that the Slaters' house fell well within the broad architectural spectrum of [Town & Country Estates] houses. <u>Applied to the . . . subdivision and the Slaters' plan, we hold that Article V lacks sufficient objectivity, and is vague to a degree that denies substantive due process to the Slaters</u>.

<u>Town & Country Estates</u>, 740 P.2d at 671. (Emphasis supplied.)

In the case before us, plaintiffs contend that § 27-1-703, MCA (1987), arbitrarily prejudices plaintiffs by requiring them to exonerate nonparties. They contend there is no reasonable basis to require any plaintiff to prepare a defense at the last minute for nonparties whom defendants seek to blame for the injury, but who have not been joined as defendants; and that there is no reasonable basis for requiring plaintiffs to examine jury instructions, marshal evidence, make objections, argue the case, and examine witnesses from the standpoint of unrepresented parties, particularly when they do not know until the latter part of the trial that defendants will seek to place blame on unrepresented persons. These procedural problems form the bases for our holding that § 27-1-703, MCA (1987), in part violates substantive due process.

We conclude that § 27-1-703(4), MCA (1987), unreasonably mandates an allocation of percentages of negligence to nonparties without any kind of procedural safeguard. As a result, plaintiffs may not receive a fair adjudication of the merits of their claims. It imposes a burden upon plaintiffs to anticipate defendants' attempts to apportion blame up to the time of submission of the verdict form to the jury. Such an apportionment is clearly

19

unreasonable as to plaintiffs, and can also unreasonably affect defendants and nonparties.

We note that other states have enacted tort legislation allowing the inclusion of nonparties. Colorado, as an example, allows the inclusion of nonparties when apportioning fault, but only when notice has been given by the defendant within 90 days of commencement of the action. See Colo. Rev. Stat. § 13-21-111.5 (1987). Indiana requires a defendant to assert a nonparty defense and to bear the burden of proof of that defense if the defense is asserted as part of an answer filed more than 45 days prior to the running of the statute of limitations on a claim against a nonparty. See Ind. Code § 34-4-33-10 (1985). Like Indiana, Kansas places the burden of bringing in other parties, including those who have settled, on the defendant. Glenn v. Fleming (Kan. 1987), 732 P.2d 750, 756. Although Kansas has abolished joint and several liability altogether, it does not allow apportionment of percentage of total damages to any person who is not a party. See Kan. Stat. Ann. § 60-258a(d) (1977). The establishment of the nonparty defense in Indiana has brought many questions about the definition of "nonparty" and the procedural mechanisms for bringing in additional defendants. Schwartz, Comparative Negligence § 16.5 (2d ed. 1986 & Supp. 1993).

Numerous other comparative negligence statutes--although rarely similar to an act of another state--include some type of procedural safeguard for plaintiffs, defendants and nonparties. Ohio's tort reform law, for example, limits allocation of

20

negligence to parties before the court.  Schwartz, Comparative Negligence § 16.5 (2d ed. Supp. 1993); Ohio Rev. Code Ann. § 2315.19(B)(4) (1991).  New Mexico allows settling defendants to be called as witnesses and allows discovery regarding such witnesses as if they remained in the action.  Wilson v. Gillis (N.M. Ct.App. 1986), 731 P.2d 955, 958.

We have noted some of the procedural safeguards provided by other jurisdictions to emphasize that Montana's statute provides none of these protections.  Our review of the comparative negligence statutes from other jurisdictions does not provide much help in the present case, however.  Nearly every state has a unique statute with nuances which make its case law interpreting the statutes of little help to other courts.

We have previously mentioned that SB 51 was patterned after Washington state's statute.  Yet SB 51 is substantially different from the 1986 enactment of Wash. Rev. Code Ann. 4.22.070, which is also set forth in the appendix to this opinion.  A striking difference is that the Washington statute preserved joint and several liability for innocent plaintiffs.  In contrast, § 27-1-703, MCA (1987), treats all plaintiffs alike, lumping totally innocent plaintiffs--like R.M. in this case--with those plaintiffs whose comparative negligence may be as much as 50 percent.  The effect of § 27-1-703, MCA (1987), is to diminish plaintiffs' ability to collect 100 percent of damages in situations like the present case.  Where the trier of fact attributes less than 51 percent of the negligence to each person on the verdict form,

21

plaintiffs may be unable to collect for the portion of negligence attributable to judgment-proof defendants, immune tortfeasors, or other persons who may be included on the verdict form but who have not been a part of the action.

Such was the case with the persons listed on the special verdict form in the present case. Edna Goodwin was an unrepresented nonparty on the basis of her settlement prior to trial. Although Goodwin settled prior to trial and was no longer a party, she nonetheless was included on the verdict form as a settling party pursuant to § 27-1-703(4), MCA. No attorney represented Goodwin's interests at trial and as a result, it is possible that the application of percentage of negligence was higher than would have been appropriate had the facts as to her case been presented by her own counsel.

None of the parties introduced evidence relating to the standard of care of a professional counselor. Goodwin was included on the verdict form as required by § 27-1-703(4), MCA, without any instruction to the jury as to the proper standard of care for a professional counselor. On the verdict form the jury allocated 35 percent of the negligence to Ms. Goodwin, 35 percent to Mrs. Kuipers and 30 percent to the Department. Section 27-1-703(5), MCA, provides that if a party is found to be less than 50 percent negligent, that party is liable for contribution only up to the percentage of negligence attributed to him. As a result, under the verdict given, if any party is unable to pay the full amount of the judgment against that party, there will then be an inability on the

22

part of the plaintiffs to collect all damages. See State ex rel. Deere & Co. v. District Court (1986), 224 Mont. 384, 730 P.2d 396, for its treatment of joint and several liability prior to the 1991 enactment of § 27-1-703(5), MCA.

In many jurisdictions--some mentioned above--comparative negligence statutes allow an apportionment of liability to immune parties and settling parties. However, these jurisdictions have procedural aspects which provide for notice to plaintiffs, specific burdens of proof, and other procedures for safeguarding the rights of all involved--parties and nonparties alike. Consideration of these procedural protections should have been considered by the Montana Legislature at the time of the enactment of the statute.

While the listed reasons for enactment of comparative negligence tort reform legislation are valid governmental purposes, we conclude that the Montana Legislature has acted arbitrarily and unreasonably in responding to this need. We conclude that the allocation of percentages of liability to nonparties violates substantive due process as to the plaintiffs.

We hold that the following portion of § 27-1-703(4), MCA (1987), violates substantive due process:

> . . . persons released from liability by the claimant, persons immune from liability to the claimant, and any other persons who have a defense against the claimant. . . .

While we hold that the naming of "any other persons who have a defense against the claimant" violates substantive due process where such persons are not parties, we further emphasize that the reference in the statute to "any other persons who have a defense

23

against the claimant" is so vague as to make its meaning impossible to understand.

This raises the question as to whether the above holding renders the entire statute unconstitutional. In the enactment of SB 51, the 1987 Montana Legislature included the following "severability clause":

> Section 3. **Severability.** If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

Chapter 505, 1987 Mont. Laws 1232, 1233.

As pointed out in Montana Auto. Ass'n v. Greeley (1981), 193 Mont. 378, 399, 632 P.2d 300, 311, if the invalid part of a statute is severable from the rest, the portion which is constitutional may stand while the part which is unconstitutional is stricken and rejected. That case further emphasized that a statute is not totally destroyed because of an improper provision, unless such provision is necessary to the integrity of the statute, or was an inducement to its enactment. When an unconstitutional portion of the act is eliminated, if the remainder is complete in itself and capable of being executed in accordance with apparent legislative intent, it must be sustained. Montana Auto. Ass'n, 632 P.2d at 311.

We here conclude that the unconstitutional portion of § 27-1-703(4), MCA (1987), is not essential to the integrity of the statute, nor was it an inducement to its enactment. We further conclude that the remainder of the statute is capable of being

24

executed in accordance with the legislative intent. As a result of our holding of unconstitutionality, we have eliminated that portion of the statute which allowed an allocation of negligence to nonparties, and in particular to nonparties who had been released from liability by the claimant, nonparties who were immune from liability to the claimant, and any other nonparties who have a defense against the claimants.

Therefore, in accord with our holding, the lined through portion of § 27-1-703(4), MCA (1987), as illustrated below is hereby excised from the statute as unconstitutional:

> **27-1-703.  Multiple defendants -- determination of liability.  . . .**
>
> (4)  On motion of any party against whom a claim is asserted for negligence resulting in death or injury to person or property, any other person whose negligence may have contributed as a proximate cause to the injury complained of may be joined as an additional party to the action.  For purposes of determining the percentage of liability attributable to each party whose action contributed to the injury complained of, the trier of fact shall consider the negligence of the claimant, injured person, defendants, [and] third-party defendants, persons released from liability by the claimant, persons immune from liability to the claimant, and any other persons who have a defense against the claimant.  The trier of fact shall apportion the percentage of negligence of all such persons.  However, in attributing negligence among persons, the trier of fact may not consider or determine any amount of negligence on the part of any injured person's employer or coemployee to the extent that such employer or coemployee has tort immunity under the Workers' Compensation Act or the Occupational Disease Act of this state, of any other state, or of the federal government.  Contribution shall be proportional to the liability of the parties against whom recovery is allowed.  Nothing contained in this section shall make any party indispensable pursuant to Rule 19, Montana Rules of Civil Procedure.

**ISSUE III:  Counselor's standard of care.**

Did the District Court err in allowing the jury to allocate a percentage of negligence to Edna Goodwin when evidence was not introduced as to the standard of care for a professional counselor?

The issue presented is whether the jury was properly instructed as to the remaining defendants' burden in establishing the negligence of a professional counselor.  The jury was allowed to apportion negligence to Goodwin based on an ordinary standard of care instruction.  Plaintiffs contend that the District Court should have instructed the jury on the standard of care for a professional counselor.  The District Court determined that no standard of care had been established by expert testimony for a professional counselor.  This Court has not previously ruled on whether the standard of care for a mental health counselor must be established by expert testimony or whether the jury is able to determine this on their own.  We address this issue for the benefit of the parties in the event it remains an issue on retrial.  It is the rule in Montana that expert testimony is required as to the standard of care, and as to the professional's violation of that standard of care, before a trier of fact may find such professional negligent.  In Carlson v. Morton (1987), 229 Mont. 234, 239, 745 P.2d 1133, 1136, the Court stated that expert testimony identifying the doctor's care as negligent or the doctor's own testimony clearly establishing his own conduct as negligent was necessary.  This has been applied as well to dentists and orthodontists in Llera v. Wisner (1976), 171 Mont. 254, 262, 557 P.2d 805, 810; to manufacturers and distributors of pharmaceuticals in Hill v. Squibb

26

& Sons (1979), 181 Mont. 199, 207, 592 P.2d 1383, 1388; and to abstractors of title in Doble v. Lincoln County Title Co. (1985), 215 Mont. 1, 5, 692 P.2d 1267, 1270. Most recently, the Court has required expert testimony to establish the standard of care for a veterinarian in Zimmerman v. Robertson (1993), 259 Mont. 105, 108, 854 P.2d 338, 340.

The rationale for requiring expert testimony to establish a standard of care for professionals acting in their professional capacity is that such professionals are required to possess a minimum standard of special knowledge and ability, and as a result juries which are composed of laypersons are normally incompetent to pass judgment on such questions without the assistance of expert testimony. Carlson, 745 P.2d at 1137. Professors Prosser and Keeton suggest that although most of the decided cases have dealt with medical doctors,

> the same is undoubtedly true of dentists, pharmacists, psychiatrists, veterinarians, lawyers, architects and engineers, accountants, abstractors of title, and many other professions and skilled trades.

Zimmerman, 854 P.2d at 339, citing Prosser & Keeton on The Law of Torts, § 32 (5th ed. 1984). Montana's prior decisions on this issue are in accordance with the general rule as summarized by Prosser and Keeton.

We hold that expert testimony was required to establish the standard of care for Ms. Goodwin as a professional counselor before the jury could allocate a percentage of negligence to her.

Section 27-1-703(4), MCA, mandated that the trier of fact consider the negligence and apportion the same to persons such as

27

counselor Goodwin who have been released from liability. As a result, the District Court was faced with the difficult decision and concluded that in order to comply with the statute, it was necessary to instruct the jury to use the ordinary standard of care to apportion negligence to counselor Goodwin. This was necessary because neither party had established a standard of care for a professional counselor and the question arose at the time of settling jury instructions, which was after the conclusion of the submission of evidence. While the District Court had limited choice, we conclude that it was reversible error to apply the ordinary negligence standard to counselor Goodwin.

We hold that the District Court erred in permitting Goodwin's name to be listed on the special verdict form when the standard of care for a professional counselor had not been established by evidence, and there were no specific jury instructions as to the professional standard requirement.

### ISSUE IV: Admission of evidence.

Did the District Court err in admitting evidence concerning R.M.'s biological parents?

At the beginning of the trial, plaintiffs submitted a Motion in Limine to exclude all of defendants' highly prejudicial evidence concerning R.M.'s natural parents. Although plaintiffs themselves introduced evidence that R.M.'s natural parents both had low I.Q.s, and had used alcohol and kept her in a neglectful environment during the first few months of her life, they contend on appeal there was no evidence submitted which demonstrated that R.M.'s parents' genetics or actions caused any mental or physical defects

28

to R.M. As a result, plaintiffs contend the District Court committed reversible error in allowing the Department to introduce certain evidence and to argue and comment on such evidence during its closing argument.

At the beginning of the trial, the Department argued that it could establish a causal connection between the natural parents and R.M.'s mental impairment. Premised upon the establishment of a causal connection, the District Court allowed the defendants to introduce evidence about the natural parents. Plaintiffs argue that the connection between the natural parents and R.M.'s mental impairment was never made, that the court erred in failing to admonish the jury and again erred in allowing closing arguments on the evidence. They contend this was plain error under Montana law and should have been excluded as more prejudicial than probative. They claim that without any connection to R.M.'s present condition, the evidence concerning her natural parents was inherently prejudicial and is reversible error. As explained below, we agree with plaintiffs that this was reversible error.

Defendants' closing argument included the following statements:

> Now, we know from the evidence that there are some hereditary influences at work with [R.M.]. There were drug and alcohol problems in the past there. She was a victim of early abuse and neglect. And I'm really sorry she went through that, but that's nothing that any of us can do anything about except to help her try to get over it in the future.
>
> We know that her parents had problems emotionally and socially, and we've got evidence that those kind of things have a long, lasting effect.

29

The Department contends the evidence was properly admitted for three reasons: (1) plaintiffs opened the door by asking their own experts whether genetic factors contributed to R.M.'s functional deficits; (2) defendants properly inquired about R.M.'s parents to impeach the plaintiffs' experts and since the evidence was not complete, defendants had to cross-examine the experts in this area because the experts based their opinions on incomplete information; and (3) the evidence about R.M.'s parents was relevant to R.M.'s damages because her impairments were caused by a variety of factors, including genetic factors, according to a witness for the Department, and plaintiffs' own experts testified that factors other than the brain injury contributed to her current problems. They claim this last statement that plaintiffs' own experts testified that factors other than the brain injury contributed to her current problems provided the medical link required by Kimes v. Herrin (1985), 217 Mont. 330, 705 P.2d 108.

In Kimes, the court allowed testimony regarding family fighting and drinking by the appellant's father in an action where damages were at issue and the reasons for the appellant's symptoms were critical to the issue of damages. The appellant was a two-year-old at the time of her injuries from an automobile accident. Several years later she exhibited symptoms including listlessness, drowsiness and staring. At trial, the respondent introduced testimony about family fighting and her father's drinking to show that these symptoms were caused by the appellant's environment and not the collision.

30

We stated that the evidence about her family environment was relevant under Rule 401, M.R.Evid., because it had a tendency to make the alleged cause of the symptoms more or less probable than it would be without the testimony and, thus, must be weighed to determine whether it should be excluded under Rule 403, M.R.Evid. Kimes, 705 P.2d at 110. Rule 403, M.R.Evid., provides that relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice.

The decision whether or not to exclude such evidence will not be reversed by this Court unless the district court has abused its discretion. Kimes, 705 P.2d at 110. We stated:

> We hold that the District Court abused its discretion in allowing this testimony. The District Court demonstrated some concern over the admissibility of the questioned testimony and allowed the testimony because the respondent assured the District Court that home environment would be medically linked to the appellant's symptoms. We note that both parties' expert witnesses indicated that poor home environment may cause symptoms such as were exhibited by appellant. However, no evidence at trial established a medical connection between poor home environment and the appellant's symptoms.

Kimes, 705 P.2d at 110.

In this case, the Department never made the causal connection. The Department is correct in stating plaintiffs did ask their expert some questions relating to R.M.'s biological parents. Although testimony was elicited from several witnesses regarding R.M.'s biological parents, none of the evidence links her impairment to the natural parents. After a careful review of the record, we conclude that the testimony provided by the medical experts failed to establish a medical link between the actions of

31

R.M.'s biological parents and any condition which R.M. had prior to the beatings by Dennis Kuipers. On the basis of our holding in Kimes, we conclude that the similar sort of evidence introduced here and commented upon in defendants' closing argument was more prejudicial to R.M. than probative. We further conclude, as in Kimes, that although the medical experts of both parties indicated that genetic factors and other information about the biological parents could contribute to R.M.'s present condition, no evidence was presented to make the causal connection more probable than not in this case.

We hold the District Court abused its discretion in admitting evidence concerning R.M.'s biological parents and in allowing the Department to comment on such evidence during its closing argument.

## ISSUE V: Jury Instructions.

Did the District Court err in instructing the jury?

Plaintiffs contend that the District Court made several errors involving jury instructions which constitute reversible error. We will consider the same to the extent needed by the parties on retrial. As stated in Story v. City of Bozeman (1993), 259 Mont. 207, 222, 856 P.2d 202, 211:

> When examining whether certain jury instructions were properly given or refused, we must consider the jury instructions in their entirety and in connection with other instructions given and the evidence introduced at trial.

There is no reversible error in the giving or refusing of certain instructions if the jury instructions, viewed in their entirety, state the correct law applicable to the case. Walden v. State

32

(1991), 250 Mont. 132, 137, 818 P.2d 1190, 1193. Bearing these principles in mind, we address the contentions of the plaintiffs concerning the District Court's treatment of jury instructions in this case.

a. <u>Did the District court err in instructing the jury on the Department of Family Services' duty to report child abuse to the County Attorney</u>?

The District Court refused to give a jury instruction offered by the plaintiffs on the Department's statutory duty to report child abuse cases to the County Attorney. This is a matter of interpreting § 41-3-201, MCA, which provides in pertinent part:

> (1) When the professionals and officials listed in subsection (2) know or have reasonable cause to suspect, as a result of information they receive in their professional or official capacity, that a child is abused or neglected, they shall report the matter promptly to the department of family services or its local affiliate, which then shall notify the county attorney of the county where the child resides.
>
> (2) Professionals and officials required to report are:
> . . .
> (g) a peace officer or other law enforcement official; . . .

In Demaree v. Safeway Stores, Inc. (1973) 162 Mont. 47, 54, 508 P.2d 570, 575, the Court said that a jury instruction which assumes as fact a matter legitimately in controversy, as shown by the evidence, is erroneous. The fact issue here, according to the Department, was whether "reasonable cause" to suspect abuse or neglect applied to both the law enforcement officers <u>and</u> the Department. We conclude that it applied only to the police officers.

The Department did not notify the County Attorney of the

33

report it received from the Bozeman Police Department concerning the Rax incident. We conclude that the plain language of this statute required the Department to report the Rax incident to the Gallatin County Attorney. This was not done.

Plaintiffs' proposed Instruction No. 30 relating to the Department's duty to report abuse was as follows:

> When the Department of Family Services receives a report of child abuse, it is required to report the incident to the County Attorney where the child resides.

The District Court refused to give this instruction and the plaintiffs claim this affected the percentage of negligence attributed to the Department and is reversible error. The Department contends that the instruction was properly refused as it did not apply to the evidence in this case because police had no reasonable cause to suspect abuse at the Rax restaurant. This does not agree with the record.

The record indicates police believed there was reasonable cause to suspect abuse, but determined there was no probable cause to arrest Dennis Kuipers. The officer who observed the child also testified that she was new on the job and could not readily identify certain signs which she later learned should have alerted her that the child had been abused at the Rax restaurant, and that she likely had probable cause then to arrest Dennis Kuipers. Nonetheless, that is irrelevant here because the case was reported to the Department and the statute quoted above requires the Department subsequently to report it to the County Attorney.

The "reasonable cause" reference in § 41-3-201, MCA, applies

34

to the police having reasonable cause to suspect abuse or neglect. As we have stated, it does not apply to the Department. The statute requires the Department, upon receiving such a report, to notify the County Attorney of the county where the child resides. Plaintiffs' proposed Instruction No. 30 was a correct statement of the law and was improperly refused.

One of the theories of plaintiffs' case was that the County Attorney was deprived of the opportunity to protect R.M. because of the Department's failure to comply with the statute. The District Court's failure to instruct the jury on the duty of the Department to notify the County Attorney prevented plaintiffs from arguing this theory of the case and could have affected the percentage of negligence attributed to the Department by the jury. In accord with the principles stated above from Story and Walden, refusal of plaintiffs' proposed instruction failed to state the correct law of the case.

We hold the District Court erred in refusing to give the plaintiffs' offered jury instruction relating to the Department's statutory duty to report the Rax incident to the Gallatin County Attorney's office.

b. Did the District Court err in instructing the jury on discounting economic damages?

Plaintiffs presented testimony by an expert in economics who estimated future economic damages at $1,400,000 and testified about the present value of that amount. Plaintiffs' expert prepared his evaluation by using projected future medical costs based upon figures given to him by the Missoula Community Hospital head injury

35

clinic. The economist then testified in detail about his method in reducing the damages to present value. Plaintiffs contend that the instruction given by the court allowed R.M.'s damages to be reduced twice--first by the expert's testimony and then by the jury.

Plaintiffs contend that although the District Court instructed the jury on the proper law, there was no information given to the jury from which they could base their own calculations to reduce to present value any amount they arrived at as an appropriate award if different from the amount asked for by the plaintiffs. Plaintiffs' estimate of future damages through the economist was a much larger figure than the amount allowed by the jury. Plaintiffs contend that it is not known how the jury could have reduced the award because no instruction was given in that regard. They contend there should have been another instruction telling the jury how to calculate present value if they did not accept the expert's measure of damages. The Department counters that the law of Montana allows the jury to disregard the experts entirely in determining the level of damages.

Although the plaintiffs' estimate of $1,400,000 in future medical expenses alone was uncontested and the plaintiffs asked for much more in damages, it is within the province of the jury to reject entirely the amount of damages estimated by experts. Plaintiffs argue that "we must assume that the jury followed the law in this case and again discounted the damage figures given to the jury by Plaintiff's expert." Although the amount of damages is solely within the province of the jury, the jury is not given

carte blanche in that regard and there must be some substantial evidence to support the jury verdict. Tappan v. Higgins (1989), 240 Mont. 158, 160, 783 P.2d 396, 397. The District Court correctly instructed the jury that it was not bound by the testimony of the experts. We conclude there is no basis to assume that the damage figures provided by plaintiffs' expert were discounted twice--once by the expert and again by the jury.

Instruction No. 35, offered by defendants and objected to by the plaintiffs, provided as follows:

> You must adjust future economic losses to their present cash value.
>
> Present cash value is a sum of money which, together with what that money may reasonably be expected to earn in the future, when invested at a reasonable rate of return, will produce the dollar equivalent of such future damages.
>
> In arriving at present cash value you may also consider the effect that inflation and increases in wages will have on offsetting the amounts that money will earn.

This instruction was taken from MPI 25.91; however, the pattern instruction was not given in its entirety. The following was omitted:

> The only amounts to be adjusted to present cash value are future earnings and future medical costs. The discount principles stated in this instruction do not apply to any other damages.

The Comment to this instruction states that an instruction on present value "should not be given unless there is sufficient foundation in the testimony to allow the jury to make the adjustment." MPI 25.91 Damages - Present Value.

If the instructions in their entirety correctly state the law,

37

there is no reversible error. We conclude, however, that Instruction No. 35 as given by the District Court omitted a very necessary portion regarding which amounts are to be discounted to present value and thus did not correctly state the law.

We hold that the District Court erred in instructing the jury by Instruction No. 35 and failing to include the provision that the only amounts to be so adjusted to present cash value are "future earnings and future medical costs."

For assistance at retrial, we emphasize that neither party made reference to § 25-9-402, MCA, which provides:

> **25-9-402. Findings by trier of fact -- civil actions.** In any action for personal injury, property damage, or wrongful death where liability is found after trial and in which $100,000 or more in future damages is awarded to the claimant, the trier of fact shall make a separate finding as to the amount of any future damages so awarded <u>and state whether the amount of future damages has been reduced to present value</u>. (Emphasis supplied.)

While the special verdict form used in this case provided for findings on future damages, there was no separate statement by the jury as to whether the amount of future damages had been reduced to present value as required by statute. Upon retrial, this statute should also be followed.

### ISSUE VI: Governmental Immunity.

Is the Department immune from tort liability for its failure to protect R.M.?

In its Cross-Appeal, the Department argues that it is immune from tort liability for two reasons. First, it contends that the acts of approval for adoption, foster placement and investigation of the child abuse report were quasi-judicial functions in which

38

the Department was acting in a quasi-judicial capacity and, therefore, the District Court should have dismissed the tort claim against it because the Department was acting in a discretionary capacity concerning the placement of R.M. in the Kuipers' home. Second, it argues that it is immune from tort liability based on the language of § 41-3-203, MCA, which grants immunity to persons investigating or reporting incidents of child abuse or neglect under §§ 41-3-201 or 41-3-202, MCA.

This Court has addressed and clarified the concept of quasi-judicial immunity in several cases. In Koppen v. Board of Medical Examiners (1988), 233 Mont. 214, 219, 759 P.2d 173, 176, we stated that the Board of Medical Examiners was a quasi-judicial body because of the nature of its vested discretion to determine whether or not to adjudicate an alleged violation by a licensee. However, the Board of Medical Examiners was subject to the notice and hearing requirements of the Montana Administrative Procedure Act (MAPA), § 2-4-101, MCA, et seq., and its decisions were subject to judicial review--key aspects of our ruling that the Board of Medical Examiners was a quasi-judicial body and absolutely immune in the exercise of that determination. Koppen, 759 P.2d at 176.

In so holding, we cited Butz v. Economou (1978), 438 U.S. 478, 513-14, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895, 920:

> We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages.

The Butz court characterized quasi-judicial immunity as a logical

39

descendant of prosecutorial immunity. The significance of that analogy is that immunity in both circumstances is based on the nature of the functions carried out by agencies or officials. Butz, 438 U.S. at 511-16, 98 S.Ct. at 2913-15, 57 L.Ed.2d at 919-22.

Thus, unlike the Board of Medical Examiners in Koppen, in State Bd. of Dentistry v. Kandarian (1991), 248 Mont. 444, 813 P.2d 409, the Board of Dentistry was proceeding against a nonlicensee under § 37-4-328(3), MCA, which did not require an administrative hearing before the Board of Dentistry under MAPA. The Board was acting in its capacity as an executive agency seeking an injunction in the district court, thereby putting itself in the role of litigant or advocate, not adjudicator. Kandarian, 813 P.2d at 412. The Board of Dentistry argued for immunity similar to prosecutorial immunity. We emphasized that there were procedural safeguards inherent in the prosecutorial system which acted as a check on the prosecutor's independence and which were not present in that case. Kandarian, 813 P.2d at 412.

In Koppen, 759 P.2d at 176, the Court summarized Butz and two Montana opinions, Ronek v. Gallatin County (1987), 227 Mont. 514, 740 P.2d 1115, cert. denied, 485 U.S. 962, 108 S.Ct. 1226, 99 L.Ed.2d 426, and State ex rel. Dept. of Justice v. District Court (1977), 172 Mont. 88, 560 P.2d 1328, as follows:

> [They] stand for the proposition that entities called upon to function judicially should be immunized in order to facilitate the proper execution of their duties. However, the basis for these decisions . . . is the common law.

40

Thus, our decisions governing tort liability of governmental agencies provide that a governmental entity may be immune from tort liability if it committed a tort while performing a quasi-judicial function even when the governmental unit is not characterized as a quasi-judicial entity.

We addressed this issue at some length in State ex rel. Workers' Compensation Division v. District Court (hereinafter Great Western Sugar) (1990), 246 Mont. 225, 805 P.2d 1272. We said that the core determination for immunity to apply to the function of the agency there was that it be quasi-judicial rather than administrative or ministerial, noting that our prior decisions had clouded the distinction. Section 2-15-102(9), MCA, of MAPA defines "quasi-judicial function" as:

> "Quasi-judicial function" means an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies. . . .

In Great Western Sugar, 805 P.2d at 1277, we further clarified this as follows:

> . . . Here, the statutory scheme mandates that the Division at least review a self-insurer's financial condition. Admittedly the statutes and administrative rules grant the Division discretion in renewing GW's application as a plan No. 1 self-insurer. However, in this case the Division never exercised this discretion to determine GW's eligibility to self-insure its risk under plan no. 1. Rather, there was an admitted complete failure by the Division to undertake any of the review necessary to made such a determination. Thus, the negligence occurred at a stage where the Division's function was entirely ministerial: (Emphasis supplied.)
>
> "Official action, the result of performing a certain specific duty arising from designated facts, is a ministerial act. . . . Another way of expressing the same thought is that a duty is to be regarded as

41

ministerial when it is a duty that has been positively imposed by law, and its performance required at a time and in a manner, or upon conditions which are specifically designated; the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion. . . . And that a necessity may exist for the ascertainment, from personal knowledge or from information derived from other sources, of those facts or conditions, upon the existence or fulfillment of which, the performance of the act becomes a clear and specific duty, <u>does not operate to convert the act into one judicial in its nature</u>." (Emphasis is original.)

The discretion afforded by the statutes and rules in this case was never exercised, rather, the Division breached its underlying duty, mandated by the statutory scheme for plan no. 1 insurance, to investigate GW's eligibility to self-insure. Such act was purely ministerial . . . and cannot be a basis for invoking quasi-judicial immunity:

"Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision. . . ." (Citations omitted.)

We then noted that our analysis was limited to common-law quasi-judicial immunity, but that the "exercise of judgment and discretion" required by § 2-15-102(9), MCA, of MAPA to invoke immunity was analogous to the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), under which the FTCA does not waive immunity for claims based on negligence of governmental employees exercising or performing discretionary functions of a federal agency, regardless of whether the discretion is abused. <u>Great Western Sugar</u>, 805 P.2d at 1277-78.

In Berkovitz v. United States (1988), 486 U.S. 531, 536, 108 S.Ct. 1958-59, 100 L.Ed.2d 531, 540-41, the United States Supreme

42

Court said immune acts must involve "permissible exercise of policy discretion":

> [T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

Both in Great Western Sugar and as recognized by the District Court in this case, there was a failure of the agency to follow procedures that would enable the agency to make a decision:

> The duties imposed by the statutory scheme on the Division's employee were purely investigative, ministerial and administrative. Because the Division failed to perform its duty to review or examine GW's application as prescribed by statute, and because simply performing this duty does not involve the use of quasi-judicial discretion, the Division is not protected by quasi-judicial immunity at this stage. The Division has simply not functioned as such under these facts.

Great Western Sugar, 805 P.2d at 1278. The Department is required by statute to license and train foster care providers and to investigate adoptive homes. See § 41-3-1103(b) and (d), MCA; § 41-3-1142, MCA; and § 41-3-202(1) and (2), MCA. We conclude the Department, at all times leading up to the tort sued upon in this case, was acting ministerially.

The conclusion we reach in classifying the Department's actions is significant only if quasi-judicial immunity can only attach to a quasi-judicial body which is carrying out the function. Great Western Sugar, 805 P.2d at 1276, which controls here, provides in pertinent part:

43

> We conclude that immunity does not attach because the Division is not expressly designated a quasi-judicial board, see § 2-15-124, MCA, see generally Title 2, Chapter 15, MCA, nor was it performing a quasi-judicial function as will be discussed below. . . .

The Department in this case was not a statutorily-designated quasi-judicial board. Great Western Sugar, 805 P.2d at 1277-78, provides that immunity is not confined to entities which are statutorily-designated as quasi-judicial boards. Gerber v. Commissioner of Ins. (1990), 242 Mont. 369, 371-72, 786 P.2d 1199, 1200-01, provides further clarification that quasi-judicial immunity may apply beyond the context of a quasi-judicial board as the Insurance Commissioner is not designated accordingly, yet the Insurance Commissioner may be afforded quasi-judicial immunity for quasi-judicial functions. For example, in Gerber, the Insurance Commissioner's method of conducting an investigation was protected by quasi-judicial immunity because the applicable statutes expressly designated investigations as discretionary acts. Gerber, 786 P.2d at 1200-01. See also Trout v. Bennett (1992), 252 Mont. 416, 427, 830 P.2d 81, 88.

We agree with the Department that immunity may apply to the exercise of a quasi-judicial function where there is no statutorily-designated quasi-judicial board involved in the action. However, like the Workers' Compensation Division in Great Western Sugar, the Department here was not carrying on an investigation of the sort which is granted immunity such as one that is a part of a contested case hearing; it is not entitled to immunity when it is not a quasi-judicial body carrying out a quasi-judicial function.

44

We conclude the Department was not acting in a quasi-judicial role in its actions in this case. There was no contested case hearing involved, nor was there any other adversarial type of proceeding. In addition, the Department's actions were not discretionary, but were mandated by statute and were ministerial and administrative in nature.

The Department's second argument relating to immunity is that it is granted statutory immunity by § 41-3-203, MCA, which provides immunity for persons required to report and investigate child abuse under the provisions of §§ 41-3-201 and 41-3-202, MCA. This immunity is not intended for the Department; rather, it is intended to protect individuals such as teachers, doctors, and psychologists who are required to report suspected abuse. The stated public policy of Montana is to "provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for their care and protection." Section 41-3-101(2), MCA. We conclude that § 41-3-203, MCA, also does not immunize the Department from tort liability.

We hold the Department is not immune from tort liability for its failure to protect R.M. in this case.

**ISSUE VII: Who is to be included on the special verdict form in a subsequent trial?**

On retrial, under our holding on Issue II, the trier of fact can consider the negligence of the following parties to the action: claimant, injured person, defendant and third party defendants. In the absence of a record and briefing comprehensively addressing it,

45

we conclude it is not appropriate to further address this issue.

Affirmed in part, reversed in part and remanded.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

Section 27-1-703, MCA (1987), provides as follows:

      **27-1-703. Multiple defendants -- determination of liability.** (1) Except as provided in subsections (2) and (3), whenever the negligence of any party in any action is an issue, each party against whom recovery may be allowed is jointly and severally liable for the amount that may be awarded to the claimant but has the right of contribution from any other person whose negligence may have contributed as a proximate cause to the injury complained of.

      (2) Any party whose negligence is determined to be 50% or less of the combined negligence of all persons described in subsection (4) is severally liable only and is responsible only for the amount of negligence attributable to him, except as provided in subsection (3). The remaining parties are jointly and severally liable for the total less the amount attributable to the claimant.

      (3) A party may be jointly liable for all damages caused by the negligence of another if both acted in concert in contributing to the claimant's damages or if one party acted as an agent of the other.

      (4) On motion of any party against whom a claim is asserted for negligence resulting in death or injury to person or property, any other person whose negligence may have contributed as a proximate cause to the injury complained of may be joined as an additional party to the action. For purposes of determining the percentage of liability attributable to each party whose action contributed to the injury complained of, the trier of fact shall consider the negligence of the claimant, injured person, defendants, third-party defendants, persons released from liability by the claimant, persons immune from liability to the claimant, and any other persons who have a defense against the claimant. The trier of fact shall apportion the percentage of negligence of all such persons. However, in attributing negligence among persons, the trier of fact may not consider or determine any amount of negligence on the part of any injured person's employer or coemployee to the extent that such employer or coemployee has tort immunity under the Workers' Compensation Act or the Occupational Disease Act of this state, of any other state, or of the federal government. Contribution shall be proportional to the liability of the parties against whom recovery is allowed. Nothing contained in this section shall make any party indispensable pursuant to Rule 19, Montana Rules of Civil Procedure.

      (5) If for any reason all or part of the contribution from a party liable for contribution cannot be obtained, each of the other parties shall contribute a proportional part of the unpaid portion of the noncontributing party's share and

may obtain judgment in a pending or subsequent action for contribution from the noncontributing party. A party found to be 50% or less negligent for the injury complained of is liable for contribution under this section only up to the percentage of negligence attributed to him.

Section 27-1-703, MCA (1985), provided:

**27-1-703. Multiple defendants jointly and severally liable -- right of contribution.** (1) Whenever the negligence of any party in any action is an issue, each party against whom recovery may be allowed is jointly and severally liable for the amount that may be awarded to the claimant but has the right of contribution from any other person whose negligence may have contributed as a proximate cause to the injury complained of.

(2) On motion of any party against whom a claim is asserted for negligence resulting in death or injury to person or property, any other person whose negligence may have contributed as a proximate cause to the injury complained of may be joined as an additional party to the action. Whenever more than one person is found to have contributed as a proximate cause to the injury complained of, the trier of fact shall apportion the degree of fault among such persons. Contribution shall be proportional to the negligence of the parties against whom recovery is allowed. Nothing contained in this section shall make any party indispensable pursuant to Rule 19, M.R.Civ.P.

(3) If for any reason all or part of the contribution from a party liable for contribution cannot be obtained, each of the other parties against whom recovery is allowed is liable to contribute a proportional part of the unpaid portion of the noncontributing party's share and may obtain judgment in a pending or subsequent action for contribution from the noncontributing party.

Washington state's similar statute reads as follows:

**§ 4.22.070. Percentage of fault--Determination--Limitations.**
(1) In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages, including the claimant or person suffering personal injury or incurring property damage, defendants, third-party defendants, entities released by the claimant, entities immune from liability to the claimant and entities with any other individual defense against the claimant. Judgment shall be entered against each defendant except those who have been released by the claimant or are immune from liability to the claimant or have prevailed on any other individual defense against the claimant in an amount

48

which represents that party's proportionate share of the claimant's total damages.  The liability of each defendant shall be several only and shall not be joint except:

(a) A party shall be responsible for the fault of another person or for payment of the proportionate share of another party where both were acting in concert or when a person was acting as an agent or servant of the party.

(b) If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants total damages.

(2) If a defendant is jointly and severally liable under one of the exceptions listed in subsections (1)(a) or (1)(b) of this section, such defendant's rights to contributions against another jointly and severally liable defendant, and the effect of settlement by either such defendant, shall be determined under RCW 4.22.040, 4.22.050, and 4.22.060.

(3)(a) Nothing in this section affects any cause of action relating to hazardous wastes or substances or solid waste disposal sites.

(b) Nothing in this section shall affect a cause of action arising from the tortious interference with contracts or business relations.

(c) Nothing in this section shall affect any cause of action arising from the manufacture or marketing of a fungible product in a generic form which contains no clearly identifiable shape, color, or marking.

Wash. Rev. Code Ann. § 4.22.070 (1988).