JUSTICE WEBER
dissents as follows:
I concur in the majority opinion on Issues II and III and dissent from Issue I of the majority’s opinion. I do not agree with the conclusion that § 104(b) of the Uniform Building Code (UBC) applies to establish negligence per se in this case and the conclusion that negligence was established as a matter of law. Section 104(b) of the UBC provides in pertinent part:
Additions or alterations shall not be made to an existing building or structure which will cause the existing building or structure to be in violation of any of the provisions of this code nor shall such additions or alterations cause the existing building or structure to become unsafe. An unsafe condition shall be deemed to have been created if an addition or alteration will cause the existing building or structure to become structurally unsafe or overloaded ... or will otherwise create conditions dangerous to human life.
Section 1711, provides:
All unenclosed floor and roof openings, open and glazed sides of landings and ramps, balconies or porches, which are more than 30” above grade or floor below, and roofs used for other than service of the building shall be protected by a guardrail....
*113 I do not agree that § 1711 mandates that the area where Pierce fell through the ceiling tile to the floor below was an area for which a guardrail was required according to the UBC. Nor do I agree with the majority’s conclusion that, as a matter of law, a condition was created that was dangerous to human life.
The question whether ALSC violated the UBC was presented to the jury by means of the following instruction:
Kalispell City Ordinance No. 1078, adopted as law the 1985 edition of the [UBC]. If you find that the defendant violated any provision of the [UBC] relating to human safety, such violation is negligence. You should then determine whether that negligence was a cause of the plaintiff’s injury.
According to this instruction, the jury could find that ALSC violated the UBC and, in that event, negligence is established. The court refused to instruct the jury that ALSC was negligent as a matter of law, leaving the question of whether ALSC violated the UBC — and, therefore, was negligent — to be determined by the jury pursuant to expert testimony presented at trial. The jury heard the evidence presented by the experts and had the opportunity to observe the witnesses and determine their credibility firsthand.
The District Court correctly presented the question whether the UBC was violated to the jury. The jury listened to the evidence presented and determined that there was no violation of the UBC. The evidence on this issue consisted of expert testimony from architects Hindley, Salsbury and Llewellyn. Whether the UBC had been violated was properly a question to be determined by the trier of fact based on expert testimony.
Some of that expert testimony, as emphasized in the majority opinion, was presented by the plaintiff’s expert, Professor Clark Llewellyn. Llewellyn was the only architect who testified unequivocally that the area where Pierce fell through had to be brought up to code by installing a new walking surface, lighting and guardrails even if it was not going to be used and even if the owner insisted upon leaving the area accessible without improvements. There was testimony from the other architects that such an area is up to code without improvements if no use is planned for the area.
Architect Hindley testified that the use to be made of a room determines how the UBC requirements for improvements are to be applied, specifically stating that “it is up to code if it’s not being used.” He testified that his understanding was that the use of that space was to be discontinued and that people would not be allowed in the *114 space. He considered it as dead ceiling space, which does not require improvement. After he learned that the store manager and Roy Beekman agreed to leave the door in place and that access was possible to the area, he was assured again that the area was not going to be used for any purpose. Based upon that assurance, he determined that the space did not require improvement nor did it need to be closed in by sheetrock.
The plan to close off the space was part of a change order primarily intended to provide access to the new security room. Sealing off the access by sheetrocking over the door opening was planned so that the door could be used for the new security room. Hindley and Salsbury agreed to move the door to the new security room in order to save on costs. They agreed that if the area where Pierce later fell through was going to be used by Rosauer’s, it would need improvements, including a guardrail, in order to conform to the UBC. Salsbury assured Hindley that the area was not going to be used for any purpose. Removal of the door was never a main concern; it was planned in order to provide access to the new room, not primarily to conform to the UBC. Based on Salsbury’s decision to abandon any use of the area, Hindley did not insist on closing off the space with sheetrock when he learned that, instead of closing off the room, a new door was provided by the contractor for the new room at no extra cost to Rosauer’s.
Richard Salsbury, owner-representative for Rosauer’s and an architect himself, testified extensively about the requirements for the abandoned area. As emphasized by the majority, some of his testimony was to the effect that the area did not conform to the UBC. However, his testimony equivocated — he also testified that the space was like attic space and did not need improvements unless it was going to be used. He told Hindley that Rosauer’s intended to abandon the area. Salsbury did not concede, as the majority opinion states, that the area where Pierce was injured did not conform to the UBC. What Salsbury agreed to was the statement that if the area were to be used by humans for any purpose, it did not conform to the UBC. He testified that he thought Hindley had violated the regulations of the ALA (American Institute of Architects), a professional organization for architects. Violation of an ALA regulation or ideal of conduct does not have the same significance as a violation of the UBC. The UBC is a set of minimum standards adopted as a city ordinance by the City of Kalispell.
*115 Salsbury also testified that the area was to be abandoned. He testified that unused attic space, even if there is an access door to it, does not require sealing off access to comply with the UBC. He further testified that, although there is no UBC requirement that a space has to be sealed off or improved, he decided, at the time of his initial discussion with Hindley about the space, that it be sealed off because it was going to be abandoned and not used for any purpose. Instead of closing the area by means of sheetrocking over it, the door could have been nailed shut or kept locked to prohibit access. Salsbury testified that Hindley was justified under the circumstances in accepting his statement that it would not be used. Furthermore, if Rosauer’s had not decided to have a security room built at the last stages of the project, the area would have been left as it was with no improvements. This area was only accessible by going through the manager’s office.
According to the testimony as discussed above, there was an actual dispute among the architects as to whether the facts demonstrated a violation of the UBC. Llewellyn testified that access to the area had to be closed off even if usage for any purpose was to be abandoned. Hindley testified that the UBC required that it be closed off or improved only if there was an intent to use the space. Salsbury’s testimony on direct examination was that the UBC was violated if the area was to be used; on cross-examination he testified the area was like unused attic space which did not need improvements. All three architects agreed that the area had to be improved to conform to the UBC if it was going to be used; only Llewellyn testified unequivocally that the area here did not conform to the UBC requirements even if all use was abandoned. Although Salsbury testified that if he had known the door was left in place, he would have insisted it be locked or otherwise closed off, he did not testify that it did not conform to UBC standards. His testimony was that it did not comply with ALA standards, which are different from and more exacting that the minimal requirements of the UBC.
We have held in numerous cases that expert testimony is required in order to establish the standard of care for professionals because such standards of care are outside the common experience and knowledge of lay jurors and expert testimony is required to assist them in resolving professional negligence cases. That requirement has been extended to negligence actions in Montana against veterinarians, medical doctors, lawyers, dentists, orthodontists, manufacturers of pharmaceuticals, and abstractors of title. Zimmerman v. *116 Robertson (1993), 259 Mont. 105, 107, 854 P.2d 338, 339. Most recently, we held that expert testimony was required to establish the standard of care of professional counselors. See Newville v. Department of Family Services (1994), [267 Mont. 237], 883 P.2d 793, 805. Architects are included in the group of professional fields requiring expert testimony to establish the standard of care. See Prosser and Keeton, The Law of Torts, § 32 (5th ed: 1984); Zimmerman, 854 P.2d at 339.
After admitting evidence of expert testimony to assist the lay jurors in this case in making their determination on the issue of the professional architect’s negligence, the District Court submitted the issue of ALSC’s negligence to the jury. The majority has disregarded that expert testimony from architects Hindley and Salsbury and has concluded that there was not substantial evidence to support the jury’s verdict and that the uncontroverted evidence established that ALSC’s performance of the Rosauer’s contract violated §§ 104(b) and 1711 of the 1985 edition of the Uniform Building Code. I emphasize that the evidence was not uncontroverted and there was substantial evidence from which the jury could determine either that the UBC was violated or that the UBC was not violated. The majority has usurped the jury’s role and made that determination as a matter of law. Even assuming that Hindley’s testimony was self-serving, however, that does not explain the following expert testimony from Salsbury, which I conclude constitutes substantial evidence that the UBC was not violated:
Q. [by Mr. Sullivan] Would the improvements of lighting and guard rail have been required under the Uniform Building Code if the area accessed by the door, which was left, was going to be continued to be used for any purposes?
A. Yes.
Salsbury testified that an area not used did not have to conform to the UBC requirement for a guardrail and likened the space to unused attic space. His testimony was as follows:
Q. [by Mr. Heckathorn] And if attic or if an attic space is going to be abandoned, and not used, there is no requirement, under the [UBC] to do something with the attic, is there?
A. No.
Q. And there is no problem, even if you have an access door to that unused space, you still don’t have to do anything to it, do you?
A. No.
*117 Q. If you don’t use it?
A. That is true.
Q. But, what does the [UBC] say as to when something like that attic space must be developed and—
A. When there is a use?
Q. Well, what kind of a use?
A. Use by humans.
Q. ... Under the facts that you have given us, that you had told Steve that the attic space was going to be abandoned, you don’t contend that there was some duty on the part of Steve to do something to comply with the [UBC], do you?
A. I do not, as long as the space was sealed off.
Q. Yeah. Well, no — As long as you had told him that it was going to be abandoned and not used?
A. Well, the alternatives that I discussed with Steve were that we either had to improve that area where the accident happened, so that it would be safe, or that we would have to seal it off.
Q. I think that Steve asked you, did he not, whether you would like to have that developed for storage?
A. Yes, that’s true.
Q. And you told him that you would not, that you were going to abandon it?
A. That’s true.
Q. Now, the [UBC] does not require, and I think that we have already said that, does not require work to be done in an unused attic space, even if there is an access door to it?
A. That’s true.
Q. And so, it isn’t a requirement that it be sealed off?
A. That was my decision, however, and direction.
Q. That was by direction of the UBC now?
A. Yes.
Q. There is no UBC requirement that a space has to be sealed off, and if it isn’t sealed off it has to have work done on it?
A. That’s true.
Q. And the only knowledge that Steve had again, was that you had said it was going to be abandoned?
A. Yes.
Q. And not used?
*118 A. Not used.
Q. And he was justified under those circumstances in accepting your statement that it wouldn’t be used?
A. That’s true.
Q. [by Mr. Heckathom] Now, Mr. Salsbury, we saw a lot of exhibits about the ALA and a lot of requirements and those are some of the requirements and there are a lot more, aren’t there? I mean there is a lot of requirements on an architect, you have a lot of professional responsibilities and you go to school for a long time to learn them, don’t you?
A. Yes, that’s trae.
Q. What relevance, or what did you think that all of these exhibits had to do with the issues that we have defined?
A. Well, my thinking is that these exhibits define roles, define paths of communication, define authorities and obligations.
Q. Do you think that Steve violated any of those ideals, regulation of AIA in this contract?
A. Of the AIA?
Q. Yes.
A. Yes.
The requirement of the AIA which Salsbury thought Hindley violated was the failure to recognize that there was a contract requirement that had not been completed — removing the door and sealing off the opening. That requirement was one which the contractor and the store manager agreed should be left as is with the contractor providing a new door for the security room for the same price. Violation of the AIA is not equivalent to violation of the UBC.
The majority has concluded that there was not substantial evidence to support the jury’s verdict and that uncontroverted evidence established that ALSC’s performance related to the remodeling project violated §§ 104(b) and 1711 of the UBC. I do not agree that the evidence was uncontroverted and I do not agree that ALSC’s performance violated the UBC sections. Moreover, there was substantial evidence to support the jury’s finding of no negligence on ALSC’s part.
Our role is not to reweigh the evidence when there is substantial evidence to support the jury verdict. This is not the sort ofunenclosed floor opening contemplated by § 1711 which needed to be protected by a guardrail. It was an abandoned space accessible only through the manager’s fice which Hindley and Salsbury testified did not *119 need improvement according to the UBC. Clearly this is substantial evidence to controvert other testimony provided by Llewellyn.
In addition, I do not agree that this was an unsafe condition according to § 104(b). This was an unused area and, as such, needed no improvements, according to the testimony of Salsbury and Hindley. The testimony indicated that there were many changes within the area, including the installation of conduit and other ductwork which to some extent blocked access to the area where the cooler had previously provided the floor and that this should have alerted Pierce to changes within the space. Although the access door remained where it had always been, the area inside the space behind the door was substantially changed. I do not agree with the statement of the majority that “when a functional door is provided, future use has to be presumed.”
Because of the conflicts in the evidence, I conclude the District Court properly submitted the issue of architectural negligence to the jury. I further conclude there clearly was substantial evidence presented upon which the jury could base its finding that ALSC was not negligent.
I would affirm the District Court on this issue.