05-694

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 336

DORIS NELSON, Individually, and as a Personal
Representative of the Estate of Emil J. (Jack) Nelson,

      Plaintiff and Appellant,

  v.

STATE OF MONTANA;

      Defendant and Appellee.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Liberty, Cause No. DV-03-3237
Honorable David Rice, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Norman L. Newhall (argued); Linnell, Newhall, Martin & Schulke
Great Falls, Montana

      For Appellee:

            Elizabeth S. Baker (argued); Hughes, Kellner, Sullivan & Alke,
Helena, Montana

Argued: October 25, 2006
Submitted: November 28, 2006
Decided: October 6, 2008

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     Doris Nelson (Doris) appeals from the order of the Twelfth Judicial District Court, Liberty County, granting summary judgment to the State of Montana (State) and denying her motion for partial summary judgment.  We reverse in part, but ultimately affirm.

¶2     We address two dispositive issues:

¶3     1. Is the Board of Medical Examiners entitled to quasi-judicial immunity for its actions in granting a medical license to a physician who was subject to disciplinary action for unprofessional conduct in other states?

¶4     2. Did the State owe a duty of care to Emil J. Nelson?

**BACKGROUND**

¶5     In October of 1995, Dr. Thomas Stephenson (Stephenson) applied for a medical license to the Board of Medical Examiners (Board), which at the time was overseen by the Montana Department of Commerce.  After 20 years of practice as a cosmetic surgeon in California, Stephenson sought to practice general medicine in Montana.  Stephenson's application showed he graduated from medical school in 1962, and had obtained medical licenses in California and Florida.  Materials submitted with the application disclosed that in 1994, Stephenson's California medical license had been revoked, but that the revocation was stayed pending Stephenson's successful completion of 10 years probation with conditions, including 120 days suspension and a ban against practicing cosmetic surgery during probation.  The disciplinary action resulted from Stephenson's unprofessional conduct in violation of the California Business and Professions Code.  His application stated he violated

2

Business and Professions Code § 651, false claims in advertising; § 810, fraudulent insurance claims; § 2234(a), treatment of patients; § 2234(b), gross negligence in treating patients; § 2234(c), repeated negligence in treating patients; § 2234(e), dishonesty and corruption in treatment of patients; § 2234(f), engaging in conduct which would have warranted the denial of a license because of his treatment of patients; and § 2261, signing medical documents containing false facts. With regard to the California revocation, Stephenson's application materials also revealed alcohol abuse and Demerol addiction, 11 malpractice suits, bankruptcy, and a history of poor and illegible medical records. In addition, his Florida license was suspended for failure to notify the Florida medical board of the actions taken against his license in California. The application also indicated Stephenson had taken a recent medical refresher course in Pennsylvania.

¶6 The Board requested additional information and determined Stephenson should appear before it for a personal interview. During the interview, the Board questioned him about the disciplinary action in California and his plans for practice in Montana. As a result of that meeting, the Board tabled the application and requested more information from the Fort Belknap Indian Health Hospital in Montana, where Stephenson had worked for several months. At some point during the process, the Board contacted Stephenson's California probation officer with regard to the reported Demerol addiction. The probation officer apparently stated she was new and not aware of a Demerol problem. The record reflects no further inquiry about Demerol. The Board contacted three doctors Stephenson listed as

3

references, but did not contact persons involved with the California medical board decisions, the malpractice suits, or the physicians involved in his refresher course in Pennsylvania.

¶7 The Board held a second personal interview with Stephenson in July of 1996, during which it voted to issue Stephenson a temporary license for one year based on several conditions. The Board informed Stephenson that if he did not accept the conditions, it would give him notice of a proposed denial of a license and the opportunity to contest the denial in a formal hearing. Stephenson accepted the conditions, and the Board issued Stephenson a temporary license. Upon Stephenson's request, the Board modified various conditions of the temporary license in May and July of 1997.

¶8 The Board extended Stephenson's temporary license subject to the imposed conditions in November of 1997 and again in March of 1998, to allow time to complete a peer review prior to addressing whether to grant Stephenson a permanent license. In January of 1999, the Board granted Stephenson a full, unrestricted, permanent license to practice medicine in Montana.

¶9 In November of 1999, Stephenson conducted a routine physical examination of Emil J. Nelson (Jack). Upon examining Jack's abdomen, Stephenson noted Jack possibly had an abdominal aneurysm. He stated in the medical chart that Jack would present the following week for an x-ray. Jack experienced an abdominal aneurysm rupture six days later, however, and died as a result.

¶10 Doris filed a complaint against the State as personal representative of Jack's estate, individually as Jack's widow, and on behalf of Jack's heirs. She alleged that the State

4

negligently and in violation of statute granted and renewed a temporary medical license to Stephenson, and then negligently and in violation of statute granted a full, unrestricted physician's license to Stephenson, when he had been subject to discipline for unprofessional conduct in other states. The complaint, filed in the First Judicial District Court, Lewis and Clark County, also named Stephenson; Liberty County; the Liberty County Hospital; Triangle Health Care; Triangle Health Care, PLLP; and Dr. Richard Buker. The State moved to dismiss, arguing the Board was entitled to quasi-judicial immunity. The First Judicial District Court, Lewis and Clark County, denied the motion to dismiss, determining the Board's decisions were not protected by quasi-judicial immunity because they were not made during the adjudication of a dispute or controversy. Several of the other defendants requested a change of venue to the Twelfth Judicial District Court, Liberty County, which the court granted.

¶11 The State subsequently moved for summary judgment, arguing it was entitled to quasi-judicial immunity for the Board's actions or, alternatively, that the State owed no duty of care to Jack. Doris responded and moved for partial summary judgment, arguing that the State was not entitled to quasi-judicial immunity and that it owed a duty of care to Jack in licensing Stephenson. The District Court issued an order granting the State's motion—and denying Doris's motion—on the issue of quasi-judicial immunity. Doris appeals.

**STANDARD OF REVIEW**

¶12 Summary judgment should be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Prindel v. Ravalli*

5

*County*, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19.  Here, the parties agreed in the District Court that no genuine issues of material fact existed regarding the issues presented in their summary judgment motions.

¶13     We review a district court's grant of summary judgment de novo, based on the same M. R. Civ. P. 56 criteria as the district court.  We determine whether the district court applied the law correctly.  *Germann v. Stephens*, 2006 MT 130, ¶ 21, 332 Mont. 303, ¶ 21, 137 P.3d 545, ¶ 21 (citations omitted).

## DISCUSSION

¶14     **1.  Is the Board entitled to quasi-judicial immunity for its actions in granting a medical license to a physician who was subject to disciplinary action for unprofessional conduct in other states?**

¶15     Doris argues the Board was performing ministerial and administrative functions in investigating Stephenson and granting him a license.  She also contends the Board's decision to grant Stephenson a license did not involve the adjudication of a controversy.  The State, on the other hand, argues the Board was performing discretionary, quasi-judicial functions when it issued the license because performing a background investigation is discretionary, not mandatory.  The State further argues the entire three-year process between the Board's receipt of Stephenson's application and its issuance of an unrestricted license was a controversy between the Board and Stephenson.  Prior to reaching the specific issue before us, it is helpful to review our jurisprudence involving quasi-judicial immunity.

¶16     Although Article II, Section 18 of the 1972 Montana Constitution abolished sovereign immunity, the common-law doctrines of prosecutorial and quasi-judicial immunity still exist

in Montana. *Koppen v. Board of Medical Examiners*, 233 Mont. 214, 218, 759 P.2d 173, 175 (1988) (citations omitted). The availability of quasi-judicial immunity depends upon the procedural facts of each case in which the immunity is asserted. In some cases, quasi-judicial immunity has been available. *See e.g. Koppen*, 233 Mont. at 219-20, 759 P.2d at 176; *Rahrer v. Board of Psychologists*, 2000 MT 9, ¶ 20, 298 Mont. 28, ¶ 20, 993 P.3d. 680, ¶ 20. In others, it has not. *See e.g. State v. District Court* (hereinafter *Great Western Sugar*), 246 Mont. 225, 234, 805 P.2d 1272, 1277 (1990); *Newville v. State, Dept. of Family Services*, 267 Mont. 237, 269, 883 P.2d 793, 812 (1994); *State Bd. Of Dentistry v. Kandarian*, 248 Mont. 444, 448-49, 813 P.2d 409, 412 (1991).

¶17    In some cases, we have examined the nature of the function undertaken by an administrative entity to determine whether the function was ministerial or discretionary. Where the administrative function is mandated by statute and, thus, purely ministerial in nature, the administrative entity is not acting in a quasi-judicial manner and is not entitled to quasi-judicial immunity. *See Great Western Sugar*, 246 Mont. at 232-33, 805 P.2d at 1277; *Newville*, 267 Mont. at 268-69, 883 P.2d at 812. However, where the administrative function involves discretionary decision-making by an entity, the entity is acting in a quasi-judicial capacity for which quasi-judicial immunity is available. *See Koppen*, 233 Mont. at 219-20, 759 P.2d at 176.

¶18    In addressing the application of quasi-judicial immunity to an administrative entity's actions, we also have looked to the context in which the entity was acting. In that regard, § 2-15-102(10), MCA, defines "quasi-judicial function" in terms of "an adjudicatory function

7

exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies." Thus, we have required that an administrative entity's discretionary decision-making be within the context of adjudicating a controversy or adversarial-type proceeding, such as a contested case proceeding under the provisions of the Montana Administrative Procedure Act (MAPA) (§§ 2-4-101 through -711, MCA), for quasi-judicial immunity to apply. *See Newville*, 267 Mont. at 269, 883 P.2d at 812; *Rahrer*, ¶ 20; *Kandarian*, 248 Mont. at 447-48, 813 P.2d at 411-12.

¶19 As stated above, Doris argues the District Court erred in granting the State summary judgment based on quasi-judicial immunity. She contends our case law clearly establishes that the Board was performing ministerial and administrative functions in investigating Stephenson and granting him a license, and the Board's decision to grant Stephenson a license did not involve the adjudication of a controversy. The State first responds that, pursuant to Title 37, chapters 1 and 3 of the Montana Code Annotated (MCA), the Board's decision-making functions relating to investigating applications and issuing temporary and permanent licenses to practice medicine are discretionary, rather than ministerial, thus entitling the Board to quasi-judicial immunity. The State contends, and Doris does not dispute, that the statutes in effect in 1997 when Stephenson was granted his license are applicable here. Consequently, all references to statutes contained in Title 37 of the MCA are to the 1997 version.

¶20 Title 37, chapter 1 of the MCA contains provisions generally applicable to all licensure and regulation of professions and occupations by the State and its agencies.

8

Chapter 3 of Title 37 contains the provisions specific to the licensing of physicians in this State. The provisions of Title 37, chapter 1 apply to and are intended to supplement the statutes governing the Board's actions in licensing and regulating physicians under chapter 3 unless specific provisions in chapter 3 provide otherwise. *See* § 37-1-303, MCA.

¶21 Section 37-3-321, MCA, provides that

> [i]f the board determines that an applicant for a license to practice medicine does not possess the qualifications or character required by this chapter or that he has committed unprofessional conduct, it shall refrain from authorizing the department to issue a license. The department shall mail to the applicant, at his last address of record with the department, written notification of the board's decision, together with notice of a time and place of a hearing before the board. If the applicant without cause fails to appear at the hearing or if after hearing the board determines he is not entitled to a license, the board shall refuse to grant the license.

In addition, § 37-1-316(7), MCA, defines "unprofessional conduct," in part, as "denial, suspension, revocation, probation, fine, or other license restriction or discipline against a licensee by a state, province, territory, or Indian tribal government or the federal government if the action is not on appeal, under judicial review, or has been satisfied." It is undisputed here that Stephenson's California license was conditionally revoked and his Florida license was suspended. It further is undisputed that Stephenson had not satisfied the requirements necessary to lift the conditional revocation and suspension of those licenses at the time he applied for a license in Montana.

¶22 Thus, at the time he applied for a Montana license, Stephenson had "committed unprofessional conduct." Pursuant to § 37-3-321, MCA, the Board was required to refrain from authorizing issuance of a license to Stephenson, and the department was required to

9

notify Stephenson of that decision and provide him with the opportunity for a hearing. The statutory "shall" language in § 37-3-321, MCA, clearly reflects mandatory, nondiscretionary duties. The Board may not avoid statutory requirements by the simple expedient of not making a determination that an applicant has "committed unprofessional conduct." This situation is similar to those in *Great Western Sugar* and *Newville* in which we held that an agency action which is mandated by statute is ministerial in nature and cannot provide a basis for quasi-judicial immunity. *Great Western Sugar*, 246 Mont. at 232-33, 805 P.2d at 1277; *Newville*, 267 Mont. at 268-69, 833 P.2d at 812.

¶23    The State also contends the Board's actions in investigating Stephenson's application and issuing him a temporary, and then permanent, license meet the definition of "quasi-judicial function" set forth in § 2-15-102(10)(c), MCA (2007) (formerly § 2-15-102(9), MCA (1997)). Consequently, the State asserts entitlement to quasi-judicial immunity for those actions.

¶24    Section 2-15-102(10), MCA, provides in pertinent part as follows:

> "Quasi-judicial function" means an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies. The term includes but is not limited to the functions of:
> . . . . .
> (c) issuing, suspending, or revoking licenses, permits, and certificates[.]

¶25    The State is correct that § 2-15-102(10)(c), MCA, includes the delineated actions of an agency with regard to licenses as quasi-judicial functions. The State apparently reads the statutory listing of included functions on a stand-alone basis, however, and ignores other statutory language.

10

¶26     This Court is obligated to read the statute in its entirety, giving meaning to all its parts and neither inserting nor omitting language therein. Section 1-2-101, MCA. The license-related language in § 2-15-102(10)(c), MCA, as well as the other listed functions delineated in the statute, are constrained by the preceding language of § 2-15-102(10), MCA, which requires an "adjudicatory function . . . involving the exercise of judgment and discretion in making determinations in controversies." Thus, unless the license-related functions occur while the agency is "making determinations in controversies," the agency action does not meet the statutory definition of "quasi-judicial function." Absent a quasi-judicial function, quasi-judicial immunity is not available.

¶27     We previously have discussed the necessity of the existence of a controversy in determining whether an adjudicatory function is a quasi-judicial function. In that regard, we have determined that situations where an agency is conducting a contested or adversarial proceeding pursuant to the notice and hearing provisions of the MAPA and where an agency is responding to citizen complaints which are adversarial in nature involve determinations in controversies which are adjudicatory functions and, therefore, quasi-judicial functions pursuant to § 2-15-102(10), MCA. *See e.g. Rahrer*, ¶ 20; *Great Western Sugar*, 246 Mont. at 230 and 234, 805 P.2d at 1275-76 and 1278 (citing *Koppen*, 233 Mont. at 216, 759 P.2d at 176). It is undisputed here that no formal MAPA contested case proceeding was ever noticed or initiated during the three-year period during which the Board investigated Stephenson and issued him temporary and permanent licenses to practice medicine. It also is

11

undisputed that the Board did not receive any citizen complaints or objections regarding Stephenson or his license application during those three years.

¶28   Notwithstanding, the State argues that the entire three-year process between the Board's receipt of Stephenson's application and its issuance of an unrestricted license was a controversy or adversarial proceeding between the Board and Stephenson. In support of its contention, the State points out that

> the licensing process was arduous and lengthy. Stephenson appeared before the Board, either in person or by telephone, approximately a half dozen times; was required to submit to testing and educational courses in areas specified by the Board; was subjected to strict restrictions on his practice and continued oversight by the Board; and submitted to two extensive peer reviews of his diagnosis and treatment of patients.

The State's factual recitations are correct; however, they do not support its legal argument.

¶29   "Controversy" is defined as "[a] disagreement or a dispute, esp. in public." *Black's Law Dictionary*, 354 (8th ed., West 2004). Similarly, "controvert" means "to dispute or contest; esp. to deny . . . or oppose in argument . . . ." *Black's Law Dictionary* at 354. Additionally, an "adversary proceeding" is defined as "[a] hearing involving a dispute between opposing parties." *Black's Law Dictionary* at 58. Consequently, there must be some dispute between opposing parties for a controversy or adversarial proceeding to exist.

¶30   Here, the Board received Stephenson's application for a Montana medical license in 1995; the application disclosed the conditional revocation of his California license and the suspension of his Florida license. The Board requested additional information and had Stephenson appear before the full Board for a personal interview. As a result of that interview, the Board tabled the license application, requested additional information from a

health clinic in Montana where Stephenson practiced for a short time, and then requested another personal interview with Stephenson. At this second interview, the Board voted to issue Stephenson a temporary license for one year subject to several conditions, including limitations on his medical practice as well as testing and continuing education requirements. The Board informed Stephenson that if he did not accept the conditions, it would give him notice of a proposed denial of a license and give him the opportunity to contest the denial in a formal hearing. Stephenson accepted the conditions and obtained his temporary license. The Board continued to extend Stephenson's temporary license subject to conditions, including peer reviews, and—in 1999—granted Stephenson a full, unrestricted, permanent license to practice medicine in Montana. Stephenson complied with the Board's requests at every step of the licensing process. He did not oppose the Board's decision to issue temporary licenses rather than a permanent license, nor did he oppose the conditions attached to issuance of the temporary licenses.

¶31    We conclude that, regardless of whether the Board's actions in investigating Stephenson's license application and granting him temporary and permanent medical licenses were discretionary functions, the Board's actions were not undertaken in the context of a controversy or adversarial proceeding as contemplated by § 2-15-102(10), MCA. We conclude, therefore, that the Board is not entitled to quasi-judicial immunity for its actions in granting a medical license to Stephenson. Consequently, we hold the District Court erred in granting the State's motion for summary judgment on that basis.

¶32    **2.  Did the State owe a duty of care to Jack Nelson?**

13

¶33 Doris alleged in her complaint that the State acted negligently and in violation of statute in investigating Stephenson's license application and granting him temporary and permanent medical licenses. In its answer, the State asserted the public duty doctrine as an affirmative defense. It also raised the doctrine as an alternative basis in support of its motion for summary judgment in the District Court. The State argued it owed no duty of care to Jack Nelson because the medical licensing statutes benefit the general public and do not create a special duty to an individual to protect from, or insure against, the negligent actions of a third party.

¶34 The District Court, having granted the State summary judgment based on quasi-judicial immunity, did not address the State's public duty doctrine argument. We held above, however, that the State is not entitled to quasi-judicial immunity here and, as a result, we address the issue of whether the State owed a duty of care to Jack Nelson. We do so under our longstanding practice of affirming a trial court's result, even if that result was based on incorrect reasoning. *See e.g. In re Trust B*, 2008 MT 153, ¶ 19, 343 Mont. 240, ¶ 19, 184 P.3d 296, ¶ 19; *Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, ¶ 23, 152 P.3d 1275, ¶ 23. We further observe that whether a legal duty exists can be determined as a matter of law. *Eklund v. Trost*, 2006 MT 333, ¶ 32, 335 Mont. 112, ¶ 32, 151 P.3d 870, ¶ 32.

¶35 "The public duty doctrine provides that a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Massee v. Thompson*,

2004 MT 121, ¶ 41, 321 Mont. 210, ¶ 41, 90 P.3d 394,¶ 41. The rationale underlying this doctrine is that "a duty owed to all is a duty owed to none." *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21.

¶36    An exception to the public duty doctrine exists when there is a special relationship between the governmental entity and the plaintiff which gives rise to a special duty that is "more particular than the duty owed to the public at large." *Nelson*, ¶ 22. A special relationship can be established in one of four ways:

> (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Nelson*, ¶ 22 (citations omitted). In *Nelson*, we concluded an exception to the public duty doctrine existed under the second criteria because the law enforcement officer had taken specific actions to ensure the decedent's safety and, by those actions, the officer assumed the duty to protect the decedent from harm. *Nelson*, ¶ 38.

¶37    In the present case, the issue is whether a special relationship was created between the Board and Jack via a statute. If so, an exception to the public duty doctrine exists and the State owed a duty to Jack. We begin with a brief review of our cases addressing this issue.

¶38    In *Massee*, three sons sued Broadwater County and the county sheriff for the wrongful death of their mother (Vickie), who had been fatally shot by her husband (Ray). *Massee*, ¶ 1. Vickie and Ray had a tumultuous relationship, including many encounters in which Ray threatened physical harm to both Vickie and himself using a .44 magnum pistol. These

15

encounters resulted in numerous contacts with sheriff's deputies and the sheriff himself. *Massee*, ¶¶ 5-19. Eventually, Ray fatally shot Vickie and then killed himself with the pistol. *Massee*, ¶ 20. Vickie's sons alleged that the sheriff had negligently failed to take appropriate action to prevent Ray from killing Vickie. A jury returned a verdict in favor of the sons, but the trial court subsequently vacated the verdict and granted judgment as a matter of law to the defendants. *Massee*, ¶¶ 21-22. The trial court determined, in part, that no special relationship existed between the sheriff and Vickie and, consequently, the sheriff had no legal duty to protect her from Ray. *Massee*, ¶ 23.

¶39 On appeal, we addressed whether a special relationship existed between Vickie and the sheriff so as to create an exception to the immunity provided by the public duty doctrine. Specifically, we addressed creation of a special relationship via a statute intended to protect a specific class of persons of which the injured party is a member from a particular type of harm. *Massee*, ¶¶ 42-43. Two domestic violence statutes in effect at the time of Vickie's death were at issue in *Massee*. It was undisputed that the two statutes were enacted to protect the specific class of persons who are victims of domestic violence, that Vickie was a member of that specific class of persons and that, as a result, the sheriff owed a special duty to Vickie as a member of the protected class of domestic abuse victims. *Massee*, ¶ 43. We concluded, therefore, that an exception to the public duty doctrine existed. *Massee*, ¶ 44.

¶40 We again addressed the first exception to the public duty doctrine in *Eklund*. There, Roy Trost escaped from a youth detention center and was driving a stolen vehicle. *Eklund*, ¶¶ 10-12. Law enforcement officers pursued him at a high rate of speed as they entered

16

Harlowton, Montana, in Wheatland County. Trost lost control of the vehicle and struck Donald Eklund. *Eklund*, ¶¶ 15 and 17. Eklund sued Trost, Wheatland County and the Wheatland County Sheriff, among others, alleging negligence. *Eklund*, ¶ 18. The county and the sheriff argued that no exception to the public duty doctrine existed because the statute on which Eklund relied did not create a special relationship. *Eklund*, ¶ 35. The district court concluded no exception to the public duty doctrine existed and granted summary judgment to the county and the sheriff on that basis; Eklund appealed. *Eklund*, ¶ 31.

¶41 We first observed on appeal that, in the context of claims against law enforcement officers, the public duty doctrine expresses the policy that an officer's overarching duty to protect and preserve the peace is owed to the public at large, not to individual members of the public. *Eklund*, ¶ 33 (citing *Nelson*, ¶ 21). In determining whether the public duty doctrine applied, we addressed whether a special relationship was created by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm. *Eklund*, ¶ 35.

¶42 The statute at issue, § 61-8-107, MCA (2003), provided in pertinent part:

> (2) The driver of a police vehicle or authorized emergency vehicle may:
> . . . . .
> (b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
> (c) *exceed the speed limits so long as he does not endanger life or property;*
> . . . . .
> (4) *The foregoing provisions shall not relieve the driver of a police vehicle . . . from the duty to drive with due regard for the safety of all persons,*

17

> *nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.*

*Eklund*, ¶ 36.  Although the statute uses general terms, "all persons" and "others," we held that the statute imposed a duty on drivers of law enforcement vehicles and created "a special class of persons—those, who by use of the streets and highways are potential victims of a high speed chase—to whom the duty is owed." *Eklund*, ¶ 39.  Thus, a special relationship was established and the public duty doctrine did not apply.  *Eklund*, ¶ 39.

¶43    We addressed the first exception to the public duty doctrine again recently in *Prosser v. Kennedy Enterprises, Inc.*, 2008 MT 87, 342 Mont. 209, 179 P.3d 1178.  There, Kennedy purchased property zoned for commercial use in Hamilton, Montana; the property was bordered to the west by property zoned for residential use.  Kennedy then approached the Hamilton City Zoning Board of Adjustment (Board) with a plan to modify the original restaurant on her property for use as a casino and lounge.  The Board eventually approved the plan—including a condition that Kennedy comply with all federal, state and local laws— and issued a certificate of occupancy.  *Prosser*, ¶¶ 5-6.  Neighbors living in the residentially-zoned properties to the west of Kennedy subsequently sued both Kennedy and the City, alleging in part that the Board had violated City ordinances in approving Kennedy's plan, and that various City officials had failed to abate a nuisance at the casino and failed to take legal action against Kennedy when requested by the plaintiffs.  *Prosser*, ¶ 8.  The district court granted summary judgment to the City on all claims.  *Prosser*, ¶ 9.  Specifically, the court concluded that the City owed no duty to the neighbors because no special relationship

18

existed between the City and the neighbors which would create an exception to the public duty doctrine. *Prosser*, ¶ 12.

¶44 The plaintiffs argued on appeal that a special relationship existed between them and the City pursuant to two City ordinances imposing a special duty on the City to protect them when approving Kennedy's proposed plan to modify the property. They contended that language in the two ordinances created a specific class of persons—those persons who are occupants of property in the vicinity of property which is the subject of a proposed plan—of which the plaintiffs were members and whom the two ordinances were intended to protect. Thus, the plaintiffs asserted, an exception to the public duty doctrine existed. *Prosser*, ¶ 21.

¶45 We concluded the two ordinances at issue were subparts of a grouping of City zoning ordinances, the entirety of which was intended to promote the general welfare and benefit the general public rather than a circumscribed class of persons. *Prosser*, ¶ 23. Consequently, no special relationship existed between the City and the plaintiffs which would provide an exception to the public duty doctrine. *Prosser*, ¶ 27.

¶46 Returning to the present case, the question is whether the statutes governing the regulation of the practice of medicine contained in Title 37, Chapter 3 of the MCA, were intended to protect a specific class of persons of which Jack was a member from a particular type of harm. If so, the statutes created a special relationship between the State and Jack which would constitute an exception to the public duty doctrine.

¶47 Section 37-3-101, MCA, provides:

> **Purpose.** It is hereby declared, as a matter of legislative policy in the state of Montana, that the practice of medicine within the state of Montana is a

privilege granted by the legislative authority and is not a natural right of individuals and that it is deemed necessary, as a matter of such policy and *in the interests of the health, happiness, safety, and welfare of the people of Montana*, to provide laws and provisions covering the granting of that privilege and its subsequent use, control, and regulation to the end that the *public shall be properly protected* against unprofessional, improper, unauthorized, and unqualified practice of medicine and to license competent physicians to practice medicine and thereby *provide for the health needs of the people of Montana*. [Emphasis added.]

On its face, the clear language of this statute speaks in terms of protecting the entire public—the people of Montana—via the licensing of health care providers. The statute's "intended beneficiaries" are all of the citizens of the state who receive medical care. Thus, as in *Prosser*, the explicit legislative policy and rationale for Title 37, Chapter 3 of the MCA creates an overarching duty to protect and provide for the health and welfare of Montanans. The duty is owed to the public at large. Nothing in the statutory language supports a legislative intent to protect a specific class of persons from a particular type of harm.

¶48    Section 37-3-101, MCA, is readily distinguishable from those statutes addressed in *Massee* and *Eklund* which produced different conclusions. *Massee* dealt with the specific, limited situation of a domestic abuse incident under which the law enforcement officer had specific statutory duties to advise the victim of her rights as a victim and to confiscate the weapon used in the incident. These legislatively-imposed duties owed to a specified class of Montanans—domestic abuse victims—created a special relationship between the officer and the victim. Similarly, *Eklund* addressed the specific situation of a high speed chase and the officers' statutory duty to drive with due regard for safety in that situation. Again, the

statutory duty was owed to a specified class of Montanans—those occupying the streets during a high speed chase—and, therefore, created a special relationship.

¶49 Such specificity is lacking in § 37-3-101, MCA. Rather, this statute directs the State to regulate all physicians for the benefit and protection of all Montanans. The present case is more analogous to the situation in *Prosser*, where the two city ordinances cited by the plaintiffs as creating a special relationship between them and the city were subparts of a grouping of ordinances intended in their entirety to promote the general welfare and benefit of the public at large. Here, Title 37, Chapter 3 of the MCA contains numerous statutes, the entirety of which—as stated in § 37-3-101, MCA—are intended to benefit and protect all the people of Montana.

¶50 We conclude that § 37-3-101, MCA, is not "a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm," and, therefore, the statute does not create a special relationship between the State and Jack giving rise to a special duty. Thus, we further conclude that the statutory special relationship exception to the public duty doctrine does not exist. We hold the State did not owe a duty of care to Emil J. Nelson.

¶51 We concluded above that the District Court erred in granting the State summary judgment based on the court's determination that the Board was entitled to quasi-judicial immunity. The District Court did not reach the public duty doctrine issue before it, but we may affirm a trial court's ruling where that court reaches the correct result, even if its reasoning is incorrect. *In re Trust B*, ¶ 19; *Wells Fargo Bank*, ¶ 23. Because the State owed

21

no duty of care to Jack, we hold that the District Court did not err in granting summary judgment to the State.

¶52   Affirmed.

/S/ KARLA M. GRAY

Justice W. William Leaphart, concurring in part and dissenting in part.

¶53   I concur with the Court's resolution of Issue One and dissent as to Issue Two.

¶54   At the District Court and here, the State argued that if it was not entitled to quasi-judicial immunity, it should be entitled to summary judgment because the State owed no duty of care to Jack Nelson, either pursuant to statute or common law, on the premise that the medical licensing statutes are for the benefit of the general public and do not create a special duty to an individual to protect from or insure against the negligent actions of a third party.

¶55   Whether a legal duty exists can be determined as a matter of law. *Eklund*, ¶ 32. In a negligence action, a duty may arise from a statutorily imposed obligation. *Eklund*, ¶ 38; *Prindel v. Ravalli County*, 2006 MT 62, ¶ 29, 331 Mont. 338, ¶ 29, 133 P.3d 165, ¶ 29; *Massee*, ¶ 43; *Jackson v. State*, 1998 MT 46, ¶ 62, 287 Mont. 473, ¶ 62, 956 P.2d 35, ¶ 62. It is necessary to consider the public duty doctrine when considering negligence claims against a public entity or person. *Massee*, ¶ 41. Under the public duty doctrine, "a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Massee*, ¶ 41. An exception to the public duty doctrine exists when there is a special

22

relationship between the governmental entity and the plaintiff giving rise to a special duty that is "more particular than the duty owed to the public at large." *Eklund*, ¶ 34 (citing *Nelson v. Driscoll*, 1999 MT 193, ¶ 22, 295 Mont. 363, ¶ 22, 983 P.2d 972, ¶ 22); *see also Orr v. State*, 2004 MT 354, ¶ 41, 324 Mont. 391, ¶ 41, 106 P.3d 100, ¶ 41. A special relationship can be established in one of four circumstances:

> (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Nelson*, ¶ 22. At issue in this case is whether an exception to the public duty doctrine exists by way of a statute establishing a special relationship.

¶56 In the recent *Eklund* case, the plaintiff filed suit against Wheatland County and the Wheatland County Sheriff after he was hit and injured by a vehicle being driven by another defendant, Roy Trost. *Eklund*, ¶¶ 17-18. Trost had escaped from a youth detention center and was driving a stolen vehicle. *Eklund*, ¶¶ 10-12. Law enforcement officers pursued him at a high rate of speed, even as they entered town. *Eklund*, ¶ 15. Trost lost control of the vehicle and struck Eklund. *Eklund*, ¶ 17. Wheatland County and the Sheriff argued that under the public duty doctrine they had no duty to Eklund. *Eklund*, ¶ 35. In determining whether the public duty doctrine applied, this Court addressed the first circumstance under which the exception to the doctrine is established—whether a special relationship was created by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm. *Eklund*, ¶ 35.

23

¶57 The statute at issue was § 61-8-107, MCA, regarding police vehicles, which provided in pertinent part:

> (2) The driver of a police vehicle or authorized emergency vehicle may:
> . . .
> (b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
> (c) *exceed the speed limits so long as he does not endanger life or property;*
> . . .
> (4) *The foregoing provisions shall not relieve the driver of a police vehicle . . . from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.*

*Eklund*, ¶ 36 (emphasis in original). Even though the statute uses general terms, "all persons" and "others," we concluded that the statute imposed a duty on drivers of emergency vehicles and created "a special class of persons—those, who by use of the streets and highways are potential victims of a high speed chase—to whom the duty is owed." *Eklund*, ¶ 39. Accordingly, a special relationship was established and the public duty doctrine did not apply. *Eklund*, ¶ 39.

¶58 In this case, we concluded in Issue One that the medical licensing statutes indeed impose a duty on the State to properly investigate an applicant and refrain from licensing an applicant who has committed unprofessional conduct. The question then, in determining whether the special relationship exception to the public duty doctrine applies, is whether the statutes create a special class of persons to whom the duty is owed. Section 37-3-101, MCA, provides:

> **Purpose.** It is hereby declared, as a matter of legislative policy in the state of Montana, that the practice of medicine within the state of Montana is a privilege granted by the legislative authority and is not a natural right of

24

individuals and that it is deemed necessary, as a matter of such policy and in the interests of the health, happiness, safety, and welfare of the people of Montana, to provide laws and provisions covering the granting of that privilege and its subsequent use, control, and regulation to the end that the *public shall be properly protected* against unprofessional, improper, unauthorized, and unqualified practice of medicine and to license competent physicians to practice medicine and thereby *provide for the health needs of the people of Montana*. [Emphasis added.]

¶59 Despite the Court's protestations to the contrary, this statute lends itself to the same analysis as the high speed chase statute involved in *Eklund*—that is, although the statute uses general terms, "people of Montana" and "public," it creates a special class of persons to whom the duty is owed. Since a licensed doctor does not, in fact, treat the *entirety of the Montana population*, this class consists of the doctor's patients who, by seeking care for their health needs from a licensed physician, are potential victims of unprofessional, improper, unauthorized, or unqualified practice of medicine. The *Eklund* class of potential victims using a particular street that is the scene of a high-speed chase is no different analytically from potential victims who seek health care from a particular doctor licensed by the State. Both classes, although less than the public at large, are the intended beneficiaries of the respective statutes. The patient as a potential victim presents an even more compelling argument than the random bystander to a police chase given that the patient, in reliance on the State's licensing process, has chosen this licensed doctor to attend to his or her health needs. Jack Nelson was a member of this special class of persons created by § 37-3-101, MCA. The State owed a duty to Jack, not to insure against specific instances of malpractice, but to investigate applicants and license only qualified, competent physicians from whom he might seek care for his health needs.

25

¶60 The State is concerned that if it is found to have a duty to individual patients, it would become liable for every act of negligence committed by licensed physicians. The State argues the public interest would not be served by creating a duty by which a licensing board is responsible to control the conduct of its licensees. This concern arises out of the State's mischaracterization of its duty. The State's duty is not to anticipate every interaction between a doctor and patient. Rather, the State's duty is preliminary. It occurs before a doctor ever has an opportunity to interact with a patient. That is, the State has a duty to license only qualified doctors; a duty to screen applicants who have engaged in unprofessional conduct and to require that they proceed through a contested case proceeding. Sections 37-1-305, 37-3-321, MCA. Likewise, the State's duty is not to control the conduct of its licensees at the risk of being liable for licensees' negligent acts. Its duty is to license only applicants who meet the statutory qualifications—a matter within the *State's* control. If the State fails to carry out that duty, it may be liable for its own negligence as opposed to the negligence of the licensee. If the State complies with the statutory requirements for licensing, it is not exposed to any liability for having issued the license.

¶61 Having determined that the State owed a statutory duty to Jack Nelson, it is unnecessary to determine whether a common law duty existed. *Orr*, ¶ 48. Further, a discussion of foreseeability, necessary in an analysis of common law duty, is not warranted. When the legislature enacted statutes to protect a special class—patients seeking medical care—it foresaw the harm to patients that could occur if the State failed to follow the statutes for licensing a physician.

26

¶62 The State further argues that the Board's statutory duty in granting or denying medical licenses runs to the applicant, not the patient, to ensure an applicant's due process rights are not violated. The State claims that this duty arises from the physician's property interest in the license. This contention is contradicted by the licensing statutes. Section 37-3-321, MCA, provides the procedures that are to be undertaken when a license is denied, giving rise to a contested case under MAPA. However, as stated in § 37-3-101, MCA, the purpose in denying the license of an unqualified applicant in the first place is to protect patients from unqualified, unprofessional physicians. Further, § 37-3-101, MCA, provides that the practice of medicine is a privilege and not a natural right.

¶63 I dissent. An exception to the public duty doctrine exists because there was a special relationship between Jack Nelson and the Board by virtue of § 37-3-101, MCA, which requires that the Board protect patients by investigating applicants and licensing only qualified physicians.

/S/ W. WILLIAM LEAPHART

Justice Patricia Cotter joins the dissent of Justice Leaphart.

/S/ PATRICIA COTTER

Justice James C. Nelson, concurring in part and dissenting in part.

¶64 I join the Court's decision as to Issue 1, but I note my continued disagreement with the doctrine of quasi-judicial immunity. *See Rahrer v. Board of Psychologists*, 2000 MT 9,

27

¶¶ 28-44, 298 Mont. 28, ¶¶ 28-44, 993 P.2d 680, ¶¶ 28-44 (Nelson & Trieweiler, JJ., specially concurring).

¶65    I dissent from the Court's decision as to Issue 2.  Since the medical licensing statutes protect everybody, they protect nobody.  That, in a nutshell, is the application of the public duty doctrine to the facts of this case.  There is probably no more byzantine, pernicious, or illogical a doctrine in the law than the public duty doctrine.  The public duty doctrine does not depend for its existence on any statute enacted by the peoples' representatives in the Legislature.  It is not grounded in Montana's Constitution; in fact, Article II, Section 18 prohibits it.  It has been rejected in numerous States as a throwback to a feudal time when it was thought that the King could do no wrong.

¶66    Here, the State of Montana, acting through the Board of Medical Examiners, licensed Dr. Thomas Stephenson to practice medicine in this State.  This doctor's track record includes license revocation and suspension, practice restrictions, probation, discipline for unprofessional conduct, false advertising, fraudulent insurance claims, repeated negligence in treating patients, gross negligence in treating patients, numerous malpractice suits, dishonesty and corruption in treating patients, conduct warranting the denial of his license, signing medical documents containing false facts, improperly subscribing and maintaining medical records, bankruptcy, alcohol abuse, and Demerol addiction.  *See* Opinion, ¶ 5. Yet, this Court invokes the public duty doctrine and holds that since the laws governing the regulation of the practice of medicine contained in Title 37, Chapter 3, MCA, protect "all the people of Montana," Opinion, ¶ 49, they do not, therefore, protect any of the people of

Montana from the likes of Dr. Stephenson. In short, a duty to all is a duty to none. Opinion, ¶¶ 35, 50.

¶67    The Court's position is untenable. The Legislature enacted the medical licensing laws to protect innocent, unsuspecting, sick Montanans like Jack Nelson from physicians like Dr. Stephenson. The Legislature enacted these laws to prevent the harm that foreseeably would occur if physicians like Dr. Stephenson were allowed to practice medicine in Montana. Section 37-3-101, MCA. While the Board may not have a duty to anticipate or prevent malpractice or misconduct committed by a properly licensed physician against his or her patient, the Board does have a statutory duty to license only properly credentialed, ethical, and qualified physicians in the first place. Section 37-3-101, MCA. Under the various provisions of Title 37, Chapter 3, Part 3, MCA, the Board has a clear duty to screen applicants who have engaged in unprofessional conduct, fraud, gross negligence, dishonesty, and corruption and require them to proceed through a contested case hearing. In short, the Board has a statutory duty to do what is uniquely within its power to do—to make sure that a physician with a track record like Dr. Stephenson's is not licensed and loosed upon innocent, unsuspecting, sick Montanans to perpetrate in this State the same sort of misconduct for which he was revoked, suspended, and severely disciplined in two other States. *See* § 37-3-101, MCA.

¶68    These are the statutorily imposed duties which the Board breached and for which it is liable—its duties under the laws enacted by the Legislature to screen applicants, to proceed through a contested case hearing, and to refuse unqualified, unprofessional, and corrupt

29

physicians the privilege of practicing medicine in this State. Yet, it is precisely the Board's breaches of this statutory law which this Court absolves through application of the public duty doctrine. The Court's application of the public duty doctrine under these circumstances effectively renders the provisions of Title 37, Chapter 3, MCA, unenforceable.

¶69 I detailed the legal rationale for my disagreement with this Court's continued application of the public duty doctrine in *Massee v. Thompson*, 2004 MT 121, ¶¶ 65-96, 321 Mont. 210, ¶¶ 65-96, 90 P.3d 394, ¶¶ 65-96 (Nelson, J., specially concurring and dissenting), and *Prosser v. Kennedy Enterprises, Inc.*, 2008 MT 87, ¶¶ 70-75, 342 Mont. 209, ¶¶ 70-75, 179 P.3d 1178, ¶¶ 70-75 (Nelson, J., dissenting). I am not going to explain all of those arguments again here. I suggest, though, that given the Court's decision in this case and its apparent unalterable commitment to perpetuate the public duty doctrine, the only way the doctrine will be exterminated is through the legislative process or by way of a citizen initiative.

¶70 In the meantime, I am left to wonder how one explains to Doris Nelson the outcome of this case. On one hand, we decide that the Board violated § 37-3-321, MCA, of the medical licensing statutes, Opinion, ¶ 22, and that Doris, therefore, can sue the Board, Opinion, ¶ 31. Yet, on the other hand, we turn around and hold that while she can sue the Board, she cannot obtain a just remedy for her or her late husband's injuries because the Board did not owe Jack a duty of care. Opinion, ¶ 51. We can explain to her that we are depriving her of her ability to obtain a remedy for the Board's negligence and misfeasance because of the public duty doctrine. Opinion, ¶ 50. We can tell her that " '[t]he public duty

30

doctrine provides that a governmental entity [here, the State acting through the Board] cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff.' " Opinion, ¶ 35 (quoting *Massee*, ¶ 41). Hence, we can tell her that she loses because of a logical absurdity: " 'a duty owed to all is a duty owed to none.' " Opinion, ¶ 35 (quoting *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21). In other words, since the medical licensing laws protect "all the people of Montana," Opinion, ¶ 49, they protect none of the people of Montana, Opinion, ¶ 35.

¶71 We also can tell Doris that the public duty doctrine is judicially created, *see Massee*, ¶¶ 79-87 (Nelson, J., specially concurring and dissenting), meaning that the doctrine was not enacted by any legislative process. We can tell her that the public duty doctrine is not grounded in the Montana Constitution but, rather, was created by judges who have perpetuated it for years in cases such as this. We can tell her that courts use the doctrine as a tool to shield governmental entities because judges fear that if they do not do so—i.e., if they do not proactively take action to shield governmental entities—there will be a flood of lawsuits which will adversely impact the government financially. *See* Frank Swindell, *Municipal Liability for Negligent Inspections in* Sinning v. Clark—*A "Hollow" Victory for the Public Duty Doctrine*, 18 Campbell L. Rev. 241, 249 (1996). We can tell her that there is absolutely no evidence supporting this paranoia. No doubt she will conclude that use of the public duty doctrine is motivated by the government's self-serving need to exonerate its own negligence and misfeasance. And she will be right. It is.

31

¶72 Further, we can tell Doris that notwithstanding the parade of horribles routinely thrown up in defense of the public duty doctrine, a significant number of states that have abrogated governmental tort immunity—as the Montana Constitution does at Article II, Section 18—have also rejected the public duty doctrine altogether. *See Massee*, ¶ 88 (Nelson, J., specially concurring and dissenting), and cases cited therein. We can tell her that this makes logical sense, because the public duty doctrine achieves the same result as governmental tort immunity—they both preclude a plaintiff from obtaining just compensation for injuries perpetrated by a negligent governmental actor. *See* Eugene McQuillin, *The Law of Municipal Corporations* vol. 18, § 53.04.25, at 197-98 (3d ed., West 2003) ("The public duty rule is not technically grounded in government immunity, though it achieves much the same results. Unlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was any enforceable duty to the plaintiff in the first place." (footnote omitted)).

¶73 And, we can point out to Doris that Article II, Section 18 of the Montana Constitution states that governmental entities "shall have *no* immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature" (emphasis added). We can tell her that because the Montana Legislature has not adopted the public duty doctrine by a two-thirds vote of both houses—keep in mind that judges created this doctrine—it is clear that the doctrine is unconstitutional on its face. *See Prosser*, ¶¶ 73-75 (Nelson, J., dissenting).

32

¶74 We can also tell Doris that even the black-letter law denies this Court its continuing use of the common law public duty doctrine. Specifically, § 1-1-108, MCA, says that "[i]n this state there is no common law in any case where the law is declared by statute." Accordingly, the Montana Constitution's abrogation of tort immunity likewise abrogates the common law public duty doctrine. *See Prosser*, ¶¶ 71-72 (Nelson, J., dissenting).

¶75 Yet, in the face of all this, we must also tell Doris that we will persist in applying the public duty doctrine to deny Montanans a just remedy for injuries perpetrated by governmental entities. If she concludes that our perpetuation of the public duty doctrine is little more than an exercise in legislating from the Bench, again she will be right. It is.

¶76 No doubt Doris will also conclude that she and Jack have been victimized twice by their government—once when the Board violated the law and licensed Dr. Stephenson to practice medicine, and a second time when this Court absolved this violation of the law on the basis of an antiquated legal doctrine that is anathema to common sense, logic, the law, and our Constitution. Doris will be right, again.

¶77 "The public duty doctrine frustrates the will of the people as expressed in Article II, Section 18, and this Court errs in perpetuating the doctrine's existence 36 years after the adoption of the Constitution. It is long past time that we consign this antiquated doctrine to the dustbin of history, where it belongs." *Prosser*, ¶ 75 (Nelson, J., dissenting). I simply cannot agree that a judicially created, medieval throwback to the common law can be used to deprive Doris Nelson and Jack's estate of their right to the just remedy to which they are lawfully entitled. The Board should be held liable for its negligence and misfeasance in

33

licensing Dr. Stephenson. The Board should be held accountable for violating the law. The King *can* do wrong. And in this case, the King did.

¶78     I would reverse the District Court's decision. I dissent from our failure to do so.

/S/ JAMES C. NELSON

Judge Richard A. Simonton concurs and dissents.

¶79     I dissent from the Court's decision on Issue 1, and concur with its decision on Issue 2.

¶80     I would affirm the decision of the District Court granting summary judgment to the State on the issue of quasi-judicial immunity.

¶81     Professional licensing statutes have two purposes: first, to protect the public; and second, to provide for the licensure of qualified professionals. The legislature's intent is that appointed members of a board regulating a profession determine who is qualified to be licensed. In this case, the Board of Medical Examiners is responsible for that decision. The Board of Medical Examiners consists of eleven members appointed by the Governor with the consent of the Senate and must include five members who have the degree of doctor of medicine; one member who has the degree of doctor of osteopathy; one member who is a licensed podiatrist; one member who is a licensed nutritionist; one member who is a licensed physician's assistant; and two members of the general public. The law applicable at the time Dr. Stephenson applied for licensure allowed the Department of Labor and Industry, at the direction of the Board, to issue three forms of certificates of licensure including a restricted

34

certificate and a temporary certificate. To be eligible for any one of the three licenses, an applicant must be of good moral character "as determined by the board"; be a graduate of an approved medical school; have completed an approved internship of at least one year; and be able to communicate in English. Section 37-3-305, MCA. Subsection 2 allows a conditional or probationary license to be issued even if the Board is aware of unprofessional conduct or the applicant is otherwise unqualified. Only later, in § 37-3-321, MCA, is there any reference to "refraining" from issuing a license and requiring a contested case hearing.

¶82    Under § 37-3-321, MCA, if the Board determines that an applicant is not eligible for licensure, it shall refrain from authorizing the Department to issue a license. In such an instance, the Board shall mail to the applicant notice of its decision together with notice of a hearing before the Board. "If the applicant without cause fails to appear at the hearing or if after hearing the board determines he is not entitled to a license, the board shall refuse to grant the license." Section 37-3-321, MCA. The Court concludes that if a hearing occurs, a controversy then arises and quasi-judicial immunity would be a defense. ¶ 31. However, the Board, after interviews and an investigation did determine that Dr. Stephenson was eligible for a temporary, conditional license under the authority of § 37-3-305, MCA.

¶83    Admittedly, there was not a contested case hearing after the Board denied full licensure because under § 37-3-305(2), MCA, the Board authorized the Department to issue a license subject to conditions and limitations. It authorized the issuance of a temporary and restricted certificate after an investigation and two meetings between the applicant and the Board. Presumably, any information that could have been derived from a contested case

35

hearing was gathered in a more informal manner at these meetings. The Board additionally made the applicant's conditional license subject to peer review and interviews with other physicians. It required additional education. Even though Dr. Stephenson's full licensure, which existed at the time of the alleged malpractice, was a process that took more than three years, the Plaintiff claims that the Board's considerations in 1995 and 1996 and its decision to issue a license are somehow causally related to any medical malpractice. I do not think it is necessary to reach the causation issue.

¶84    According to the Court and Plaintiff, the Board would be protected by quasi-judicial immunity if it had simply denied the license and issued a notice rather than conducting two interviews, an investigation, and other processes. If Dr. Stephenson then requested a hearing, one could have been held. If the Board had decided to issue the conditional temporary license, the defense of quasi-judicial immunity would be available. However, the Administrative Procedure Act allows for informal resolutions of contested cases, like the Board's actions with Dr. Stephenson. Section 2-4-603, MCA. That is exactly what was done here.

¶85    I believe the controlling issue in this case is: Should a licensing board's failure to strictly perform administrative tasks negate the defense of quasi-judicial immunity, which would otherwise be available to a Board making a licensing decision? I would answer the question in the negative. Unlike the Court, I believe such a result is supported by prior decisions. The division that currently exists between administrative/ministerial functions and quasi-judicial functions can be clarified.

36

¶86 In *Koppen v. Board of Medical Examiners*, 233 Mont. 214, 759 P.2d 173 (1988), this Court held that quasi-judicial immunity was a defense available to the Board of Medical Examiners despite its failure to take action on complaints about a doctor's competence. The Court recognized the discretion vested in the Board to grant, revoke, or suspend licenses. It discussed the procedure that must be followed to revoke or suspend a license, including the necessity of a contested case hearing. *Koppen*, 233 Mont. at 219-20, 759 P.2d at 176. However, there was no contested case hearing in *Koppen* because the Board did nothing in response to the complaints. Whether that inaction was a conscious choice or the result of negligence does not appear significant to the Court. The inaction is treated as a quasi-judicial act protected from liability. I agree with the result in *Koppen* where the Court states:

> The opinions in *Ronek, Dept. of Justice* and *Butz* stand for the proposition that entities called upon to function judicially should be immunized in order to facilitate the proper execution of their duties.

*Koppen*, 233 Mont. at 220, 759 P.2d at 176. The decision to take no action was made by the Board and not by an agency or department employee.

¶87 The next decision in the line of cases on this subject is *State v. District Court*, 246 Mont. 225, 805 P.2d 1272 (1990) (*Great Western Sugar*). In *Great Western Sugar*, employees of the Division of Workers' Compensation allowed an employer to self insure without requiring it to post security guaranteeing the availability of benefits. Employees of the Division of Workers' Compensation failed to follow administrative duties to determine whether the employer was eligible to self insure. None of the review necessary to make the determination was followed. The Court held, and I agree, that no quasi-judicial decision

37

making was involved. *Great Western Sugar*, 246 Mont. at 234, 805 P.2d at 1279. State employees had the responsibility to follow legislatively imposed duties to insure the availability of workers' compensation benefits. No discretion was involved. Had the employees properly done their jobs, the employer's eligibility to be self insured would have been obvious. And, as the Court notes in *Great Western Sugar*, 246 Mont. at 233, 805 P.2d at 1278, there was no policy decision that required the conscious balancing of risks and advantages, which is a prerequisite to quasi-judicial immunity.

¶88    In *Newville v. State, Dept. of Family Services*, 267 Mont. 237, 883 P.2d 793 (1994), employees of the Department of Family Services approved an application to be foster parents, apparently after only a cursory examination, and the child was subsequently seriously injured in the care of those foster parents. The Court said no quasi-judicial act was performed by the employees and therefore, immunity was not available. I agree with the result and again note that *Newville* involved employees and not a Board. The employees' acts were ministerial and not discretionary. The Department's actions were not discretionary, but were mandated by statute and were ministerial and administrative in nature. *Newville*, 267 Mont. at 269, 883 P.2d at 812.

¶89    Finally, in *Rahrer v. Bd. of Psychologists*, 298 Mont. 28, 993 P.2d 680 (2000), this Court decided that the Board of Psychologists had quasi-judicial immunity in its pursuit of a complaint against a psychologist, its decision to investigate the complaint, and its decision to hold a contested case hearing. *Rahrer*, 298 Mont. at 33, 993 P.2d at 683. Clearly in *Rahrer*,

the decision by the Board of Psychologists to pursue the complaint was protected even though the ultimate decision to dismiss the complaint was made by a hearings examiner.

¶90 The decision by the Court in this case is the first where a licensing board's decision is not protected as a quasi-judicial act.

¶91 In considering whether acts are ministerial or quasi-judicial in nature, I would also look at who performs those acts. There is certainly a difference between the actions of an employee who is performing what is required by his job (generally ministerial and administrative) and the discretionary decisions made by a Board appointed for its expertise in the licensing of professionals. The legislature has recognized the expertise of Board members in making them responsible for the screening and selection of applicants for licensure and for the discipline of licensees who act unprofessionally. This Court should grant that same deference to licensing boards. It may help resolve some of the confusion the Court recognized in *Great Western Sugar,* 246 Mont. at 228-29, 805 P.2d at 1275.

¶92 In general, any licensing board authorized by the legislature may "grant or deny a license and, upon a finding of unprofessional conduct by an applicant or license holder, impose a sanction provided by this chapter." Section 37-1-307(1)(e), MCA. Likewise, any Board which decides that a license applicant is unable to practice with reasonable skill and safety may restrict or limit the practice of the applicant, require completion of specific programs, monitor the practice, or establish conditions of probation for a designated period of time. Section 37-1-312(1), MCA. That statute, like § 2-4-603, MCA, also provides that the Board and a license applicant can enter into stipulated agreements to resolve disputes.

39

The legislature recognized that not all applicants may initially be qualified for licensure and provided that the Board of Medical Examiners may hold hearings and establish programs to assist and rehabilitate those with mental or physical problems. Section 37-3-203, MCA. As previously stated, § 37-3-305(2), MCA, allows the Board to authorize the issuance of licenses subject to terms of probation, other conditions, or limitations that it sets. Once the Board receives an application, it may make an independent examination and can require whatever records and information it desires in determining whether the application should be granted. Section 37-3-309, MCA.

¶93    The Court seems to ignore the authority and discretion of the Board by relying on the language in § 37-3-321, MCA, which says the Board shall refrain from authorizing the issuance of a license if the Board determines that the applicant does not possess the qualifications or that he has committed unprofessional conduct. In deciding that the applicant in this case is guilty of unprofessional conduct and is not qualified to practice, the Court, however, is substituting its judgment for that of the Board. Fact finding is the province of the Board, not this Court.

¶94    The Court notes that the Board did exercise its authority and duties in requesting additional information and in determining that Dr. Stephenson should appear before it for a personal interview. Dr. Stephenson was questioned about the disciplinary action in California. Having considered that, the Board tabled his application and requested even more information. The Board contacted Dr. Stephenson's probation officer, three doctors who Dr. Stephenson had listed as references, and then held another personal interview with

40

him. Only then did it authorize a temporary restricted license to Dr. Stephenson who was also given the option of declining it and then having a contested case hearing. Dr. Stephenson agreed to the conditions, and an informal resolution was reached. Only after peer reviews, additional education, and the passage of three years was Dr. Stephenson granted full licensure.

¶95 After defining ministerial functions as a duty imposed by law where actions are not discretionary but mandated by statute, the Court limits quasi-judicial acts subject to immunity only if they are discretionary in nature and in the context of a contested or adversarial type of proceeding. Quasi-judicial function is defined in § 2-15-102(10), MCA, as:

> an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies.

It includes "issuing, suspending, or revoking licenses, permits, and certificates." "Holding hearings" is only an example of a quasi-judicial function. Now the Court has limited the power of the Board to issue temporary or restricted licenses by requiring a contested case hearing before it will be protected by quasi-judicial immunity. In effect, the Court is saying the Board's decision to issue a medical license becomes a quasi-judicial function only after a contested case hearing is held. But it is the Board's initial inquiry or investigation and its discretionary weighing of facts, combined with its discretionary decision to grant or not grant a license that is the quasi-judicial function. In this instance, because the Board exercised its discretion to make its decision, it should be cloaked with the protection of quasi-judicial immunity.

¶96 The Court states that the process involved in this case was never adversarial. There is no requirement that the process be adversarial. There is a requirement that there be a controversy and certainly the applicant's request for full licensure and the Board's denial of it created a controversy.

¶97 In my opinion, the Court has substituted its judgment for that of a specialized board composed of individuals best qualified to decide who should be licensed to practice medicine and under what conditions. The decision to refrain from licensing and then to allow it on a temporary restricted basis was certainly not just a ministerial act, but was an exercise of the Board's discretion which should entitle it to quasi-judicial immunity.

¶98 While I dissent from the Court's opinion on Issue 1, I agree with the Court's conclusion on Issue 2 that the judgment of the District Court must nevertheless be affirmed because the Board is insulated from liability on the basis of the public duty doctrine.

/S/ RICHARD A. SIMONTON
Honorable Richard A. Simonton, District Judge,
Sitting in place of Justice Brian Morris

Justices John Warner and James A. Rice join in the foregoing dissent and concurrence.

/S/ JOHN WARNER
/S/ JIM RICE

42